Stanley WILLIAMS, Petitioner,

v.

Arthur CALDERON, Warden
of California State Prison at
San Quentin, Respondent.

No. CV 89–0327 SVW.

United States District Court,
C.D. California.

March 25, 1998.

984

## ORDER ON RESPONDENT'S MOTION FOR EARLY SUMMARY JUDG-MENT/ADJUDICATION

WILSON, District Judge.

**DEATH PENALTY**

## I. *INTRODUCTION*

Before this Court is Respondent's Motion for Early Summary Judgment/Adjudication. The motion came before the Court for oral argument on February 9, 1998. Having carefully considered all papers filed in support of and in opposition to the motion, and oral argument thereon, the Court hereby **GRANTS IN PART** the Motion for Early Summary Judgment/Adjudication.

## II. *BACKGROUND*

### A. 7–Eleven Murder

Alvin Owens was an employee at a 7–Eleven store in Whittier. Alfred Coward, known as "Blackie," testified as an immunized witness at petitioner's trial and gave the following account of Owens's death:

At approximately 10:30 p.m. on February 27, 1979, petitioner Stanley Williams came to Coward's house. The two went to the home of James Garrett (where petitioner was staying) and petitioner went inside, returning with a sawed-off shotgun. He was accompanied by a man named Darryl. The three men made several stops, including one to obtain "sherms" (cigarettes containing phencyclidine (PCP)). They all shared a sherm, then picked up Tony Sims. Petitioner shared a second sherm with Coward and Sims, and asked Sims if he knew where they could "make money" in Pomona.

Taking two cars, the foursome made two unsuccessful restaurant and liquor store robbery attempts, and eventually went to a 7–Eleven where Owens, the victim, was sweeping the parking lot. Sims and Darryl went into the store followed by Owens, petitioner, and Coward. Coward testified that he saw no one with a weapon except petitioner, who approached Owens and told him to keep walking. Owens walked toward the back rooms of the store with petitioner and Coward following him. Petitioner told Owens to lie down and he complied. Coward heard a gun being loaded, heard a shot and glass breaking,[1] followed by two more shots. The group then returned to Sims's house where the money was divided. Sims asked petitioner why he had shot Owens and petitioner explained he did not want to leave any witnesses. He also said the shotgun shells could not be traced and that he had retrieved a few of them.

Coward saw petitioner later that morning at petitioner's brother's house. He stated that petitioner told his brother, "You should have heard the way he sounded when I shot him." Petitioner then made a growling noise and laughed hysterically.

### B. The Brookhaven Motel Murders

Robert Yang and his family owned and lived in the Brookhaven Motel on South Vermont Street in Los Angeles. About 5 a.m. on March 11, 1979, Yang heard a

---

1. A television monitor in the store had been shot out.

woman's screams and three or four shots. A few minutes later he left his bedroom and saw that the door separating the motel office from the living quarters had been forced open from the outside. He discovered his father, mother, and sister had all been fatally wounded. The cash drawer was open and empty.

The police found two shotgun shell casings at the scene. A firearms expert testified that one of the shells could have been fired only from a weapon identified as having been purchased by petitioner in 1974.

Three witnesses provided testimony regarding petitioner's involvement in the Brookhaven Motel murders. Samuel Coleman, a friend of petitioner's, testified as an immunized witness that on March 10, he and petitioner went to the Showcase Bar where he remained until it closed around 6 a.m. He last remembered seeing petitioner about 2:30 a.m. The next day petitioner told him that he had robbed and killed some people on Vermont Street.

James Garrett testified that petitioner kept some of his possessions at the Garrett house and stayed there approximately five days a week. Early on the morning of March 13, 1979, petitioner told Garrett and Garrett's wife, Esther, that he had heard that some Chinese people had been killed on Vermont Street. Petitioner said he did not know how the killings had occurred but thought the killers were professionals because no shells or witnesses had been left. He went on to say that he heard the killings had occurred at 5 a.m., that two men had knocked down the door, and that the men had taken $600.

Later, petitioner again spoke about how the people were killed, stating "after the big guy knocked the door down, he went in the motel, and there was a guy laying on the couch, and he blew him away." Petitioner said the man on the couch and a woman at the cash register were shot twice, and another woman was also shot. Petitioner told Garrett he was the "big guy."

Esther Garrett testified to essentially the same matters as her husband. Esther also said petitioner told them the killers were using the money to buy PCP and that the killers had picked up the bullets so there would be no evidence for the police. After her husband left, petitioner told Esther he had committed the murders with his brother-in-law.

George Oglesby, also known as "Gunner," provided additional testimony. Oglesby was an inmate who was housed in the same cell block as petitioner, a few cells away.[2] Oglesby testified that in late April 1979, petitioner asked him about the chances of escaping from Atascadero or Patton, where petitioner believed he might be sent. He later asked Oglesby if he wished to be included in an escape plan and Oglesby indicated he did. Petitioner outlined a plan complete with drawings that involved escaping while being transferred from jail to court. According to the plan, as summarized by Oglesby, two people from "the outside" would disarm the officer driving the bus. Petitioner planned to kill a person on the bus who was to testify against him as well as the two officers who would accompany the bus. Petitioner later modified the plan to include blowing up the bus to prevent the authorities from quickly determining who had escaped. Oglesby received two notes

2. At the time of his testimony, Oglesby had pleaded guilty to second degree murder, but had not been sentenced. He was originally charged with first degree murder, two counts of kidnaping, and one count of rape; special circumstances also were alleged. The special circumstance allegations were later dropped. As a part of his plea, the remaining counts and a use allegation were to be dismissed.

A supplementary probation report prepared on Oglesby indicated the charge eventually would be reduced to manslaughter because he was to testify in other cases. Oglesby also testified that he understood that his attorney had spoken to the district attorney who was prosecuting petitioner's case about reducing the charges against him to second degree murder. He also hoped to receive protective housing in another state.

from petitioner relating to the escape plan. A few days after receiving the notes Oglesby told a police officer, Lieutenant Fitzgerald, what he knew about the escape. After talking to Fitzgerald, Oglesby communicated several more times with petitioner about an escape and petitioner sent several notes to Oglesby regarding the escape.

In addition to relating the escape plans, Oglesby testified that petitioner told him that he, Blackie, and two others had robbed a motel and had shot the people inside—a man, a woman, and a child, possibly a daughter.

Petitioner presented an alibi defense. Beverly McGowan testified that on February 27, 1979, the night of Owens's murder, she and petitioner dined and spent the night together. Fred Holiwell, petitioner's stepfather, testified that on Sunday morning, March 11, the night of the Brookhaven murders, he arrived at the Showcase Bar around 3:30 a.m. He thought he saw petitioner in the parking lot at about 5 a.m.

Eugene Riley, an inmate in the same cell block as petitioner, testified that on the morning of March 11, he saw petitioner in the parking lot of the Showcase Bar about 5 a.m. and gave him a ride home around 5:30 a.m. Joseph McFarland, another inmate in petitioner's cell block, testified he knew Oglesby was a "jailhouse rat" and that others knew this as well. McFarland stated that inmates gave Oglesby false information because they knew he was an informant.

### III. PROCEDURAL HISTORY

The jury convicted petitioner of four counts of murder. They found true the special circumstance allegation that the murders were committed in the course of robberies, and multiple murder. No evidence was presented by either side at the penalty phase. The jury sentenced petitioner to death.

Petitioner's conviction and sentence were automatically appealed to the California Supreme Court. In 1984, Williams filed a petition for writ of habeas corpus in the state supreme court. The direct appeal and habeas petition were consolidated. The California Supreme Court ordered an evidentiary hearing on the issue of whether Oglesby deliberately elicited incriminating statements from petitioner in violation of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). After the hearing, the state court denied the petition, finding that no Massiah/Henry violation occurred, and affirmed petitioner's conviction and sentence. People v. William; In re Williams (Williams I), 44 Cal.3d 1127, 245 Cal.Rptr. 635, 751 P.2d 901 (1988).

On January 9, 1989, Williams filed a second state habeas petition. The petition was denied without explanation on January 18, 1989. On January 23, 1989, Williams filed a federal habeas petition. Respondent filed an answer on March 3, 1989. Petitioner was ordered to return to state court for exhaustion and the Court held the federal proceedings in abeyance pending completion of the state proceedings.

On September 1, 1989, Williams filed a third state habeas petition. The state supreme court ordered an evidentiary hearing on the claims in the petition. The evidentiary hearing concluded in May 1992. The California Supreme Court denied the third state habeas petition on April 11, 1994. In re Williams (Williams II), 7 Cal.4th 572, 29 Cal.Rptr.2d 64, 870 P.2d 1072 (1994).

Williams filed a fourth state habeas petition on April 15, 1994. On June 21, 1995, the California Supreme Court denied the petition on the merits and on procedural grounds.

Petitioner filed an amended federal petition on November 13, 1995. Respondent filed an answer to the amended petition on February 10, 1997, and filed the instant motion on April 7, 1997.

### IV. LAW ON MOTIONS FOR SUMMARY JUDGMENT

To succeed on a motion for summary judgment, a defendant may demonstrate

that there is no genuine issue of material fact by pointing to the absence of evidence produced by the plaintiff to support his case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In the alternative, a defendant may demonstrate affirmatively through admissible evidence that there is no triable issue of material fact as to each element of its affirmative defenses and that it is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.Pro. 56(c). *See also Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986). A motion for summary judgment is properly brought in habeas corpus proceedings. *Blackledge v. Allison,* 431 U.S. 63, 80, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).

To overcome a defendant's motion for summary judgment, a plaintiff must set forth specific facts indicating that there is a genuine issue for trial. In other words, plaintiff must present evidence sufficient for a reasonable fact finder to find for him or her. Fed.R.Civ.Pro. 56(e); *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court is not to determine issues of credibility on a motion for summary judgment; instead, the truth of each party's affidavits is assumed. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

In a case where the judge is the sole factfinder, summary judgment should be granted where the underlying evidence is undisputed and the record on the motion persuades the court that an evidentiary hearing would add nothing to its ability to decide the case. *TransWorld Airlines v. American Coupon Exch.,* 913 F.2d 676, 684–85 (9th Cir.1990).

## V. *ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996 ("AEDPA")*

The AEDPA does not apply to cases where a federal habeas petition was filed before April 24, 1996. *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 2061, 138 L.Ed.2d 481 (1997). Williams filed his federal habeas petition on July 13, 1989, therefore, the AEDPA does not apply to his case. In ruling on this motion, the Court applies the habeas law as it existed prior to April 24, 1996.

## VI. *MERITS OF RESPONDENT'S MOTION FOR SUMMARY JUDGMENT*

In his motion, respondent identifies various claims to which he asserts he is entitled to summary judgment. The claims are addressed *seriatim* below.

### Claim A: Procedural and Substantive Incompetence to Stand Trial

Petitioner claims his constitutional rights were violated because he was tried while incompetent. In addition, petitioner claims his due process rights were violated when his trial attorney failed to request a competency hearing and the trial court failed to *sua sponte* conduct a competency hearing. (Amended Petition for Writ of Habeas Corpus ["Pet."] at 12.)

The Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. *Medina v. California,* 505 U.S. 437, 439, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). The prohibition against trying an incompetent defendant "is fundamental to an adversary system of justice." *Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). The test for competency to stand trial is whether the defendant had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he [had] a rational as well as factual understanding of the proceedings against him." *Boag v. Raines,* 769 F.2d 1341, 1343 (1985) (quoting *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam)).

Petitioner is pursuing both a procedural and a substantive incompetency claim. A procedural claim asserts that the trial court failed to conduct a competency hearing on its own initiative in violation of *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), because, at the time of trial, there was sufficient evidence of petitioner's incompetence to warrant a hearing. A substantive incompetency claim asserts that petitioner's due process rights were violated because he was tried while incompetent, regardless of whether the court should have conducted a *Pate* hearing.

### 1. *Procedural Incompetence*

 The United States Supreme Court held in *Pate* that "where the evidence raises a bona fide doubt' as to a defendant's competence to stand trial," the judge on his or her own motion must conduct a competency hearing. 383 U.S. at 385, 86 S.Ct. 836. A *Pate* hearing is required wherever a reasonable judge would be expected to have a bona fide doubt as to the defendant's competence. *Moran v. Godinez*, 57 F.3d 690, 695 (9th Cir.1994). In addressing a procedural incompetence claim, a federal habeas court may consider only the evidence that was before the trial court. *United States v. Lewis*, 991 F.2d 524, 527 (9th Cir.1993). No particular facts signal incompetence, however, suggestive evidence includes a defendant's demeanor, previous irrational behavior, and available medical evaluations. *Drope*, 420 U.S. at 180, 95 S.Ct. 896.

 Petitioner has not presented facts sufficient to establish that a reasonable judge would have had a bona fide doubt as to his competency to stand trial, therefore, the trial court did not err in failing to hold a competency hearing. Neither trial counsel, the trial court, nor the deputy district attorney raised the issue of petitioner's competence. The state court record is devoid of any reference to bizarre or inappropriate behavior by petitioner. The only mental health expert who interviewed petitioner and could provide an assessment

stated that he was competent to stand trial. (Opp.Ex. 82; CT 378.) The fact that petitioner was briefly hospitalized for a drug-induced psychotic episode several years before the trial was insufficient to warrant a hearing. The transcript of petitioner's statement to police contains no evidence of bizarre behavior or mental impairments, and petitioner responded appropriately to all questions asked by the police. Moreover, nothing in the nature of the crime suggests that the perpetrator was suffering from any mental disease or defect.

Based on the foregoing, the trial court did not err in failing to hold a competency hearing, and the Court GRANTS the motion for summary judgment on petitioner's procedural incompetence claim.

### 2. *Substantive Incompetence*

 To obtain relief on a substantive incompetence claim, petitioner must present evidence "sufficient to positively, unequivocally, and clearly generate a real, substantial and legitimate doubt as to [his] mental capacity." *Watts v. Singletary*, 87 F.3d 1282, 1290 (11th Cir.1996) (quoting *Bruce v. Estelle*, 483 F.2d 1031, 1043 (5th Cir.1973)). "In a habeas proceeding, a petitioner is entitled to an evidentiary hearing on the issue of competency to stand trial if he presents sufficient facts to create a real and substantial doubt as to his competency, even if those facts were not presented to the trial court." *Boag*, 769 F.2d at 1343 (citation omitted). Although retrospective determinations of competency are not prohibited, they are disfavored, and the Court will give considerable weight to the lack of contemporaneous evidence of petitioner's incompetence. *See Odle v. Calderon*, 919 F.Supp. 1367, 1378 (N.D.Cal.1996).

#### a. *Evidence of Incompetence*

The only significant difference between a substantive and procedural incompetence claim is the evidence the Court can consider. To determine if petitioner was actually

incompetent, the Court is not limited to the information available to the state trial judge. *Watts*, 87 F.3d at 1290. The following is a summary of the evidence petitioner has presented to support his substantive incompetence claim.[3]

### i. Declaration of Dr. Coodley

Dr. Coodley is a psychiatrist. He examined petitioner before trial and provided a report to the trial court. In his report, he noted that petitioner indicated a high degree of paranoia, but he could not say that petitioner was insane. He also stated that petitioner understood the nature of the proceedings and could cooperate in a relatively rational manner with counsel. He then opined that petitioner was unable to prepare or conduct his own defense in a rational manner. (Opp.Ex.82.)

Dr. Coodley also prepared a declaration in 1995 discussing his assessment of petitioner. Much of his declaration is a summary of the report he provided to the state court. However, habeas counsel provided him with additional information regarding petitioner's background before he prepared the most recent declaration. He asserted that the information about petitioner's drug use and brain damage, had it been brought to his attention in 1979, would have cast his findings in a different light. He stated that "[t]he extent of mental illness in Mr. Williams' family, the frequency and severity of his own psychiatric decompensations, the likelihood of organic brain damage, and the chronicity of his drug use all create major questions as to his competency. While he may have understood the nature of the proceedings against him, his ability to assist his counsel was very likely impaired." (Opp.Ex.2, ¶ 22.)

### ii. Declaration of Dr. Froming

Dr. Froming is a neuropsychiatrist. She interviewed petitioner and gave him the full range of neuropsychological tests as well as a mental status exam. Her declaration details petitioner's family's history of mental illness, his head injuries as a child, his drug abuse, and her diagnosis of his organic brain damage to the frontal lobe and right hemisphere. She concluded that this information "suggest[s] that he suffered depression, withdrawal, and quite plainly did not initially comprehend the seriousness of his confinement, the proceedings or the charges levied against him." She also stated that petitioner's "extreme responses to stress ..., his autonomic responses to constant shackling and security, and the neurocognitive deficits he exhibited (particularly his inability to comprehend new material without repetition and his distortion of information imparted to him) make it reasonably likely that he was unable to understand the proceedings, to know and assess the options open to him, or rationally cooperate with counsel during the trial process." (Opp.Ex.3, ¶ 61.)

### iii. Declaration of Dr. Woods

Dr. Woods is a psychiatrist. In preparing his declaration filed in support of the federal habeas petition, Dr. Woods interviewed petitioner, reviewed extensive documents relating to his medical and family history, and reviewed the results of Dr. Froming's tests. Dr. Woods opined that "[i]t is clear from the observations of those who knew [petitioner] perhaps better than anyone else, that he was unaware of the proceedings at times, let alone seriousness [sic] of the charges facing him and he lacked the mental faculties to assist counsel." (Opp.Ex.4, ¶ 95.)

### iv. Declaration of Donald Archie

Donald Archie stated in his declaration that he had known petitioner since junior high school. He discussed petitioner's background and childhood, including his drug abuse. He then stated that he visited petitioner in jail during the trial, and that petitioner "was definitely not himself. In my estimation, it took well over a year

---

**3.** In addressing the substantive incompetence claim, the Court also considered the evidence already discussed in relation to the procedural incompetence claim.

for the effects of the sherm and whatever else he was using, to wear off. He was so out of it; he didn't realize where he was or why he was there. I recall [petitioner] telling me at one point that he was on medication. Although he did not say it specifically, I understood it to be psychiatric medication. For most of the time that [petitioner] was in jail, he looked like a zombie; he looked deranged. During his trial, he did not seem to be paying attention." (Opp.Ex.6, ¶ 15.)

### v. Declaration of Rossalyn Blanson

Ms. Blanson was petitioner's girlfriend at the time of the murders, and was involved in his plan to escape from custody. In her declaration, she discussed his background and the various problems he experienced. She then stated:

I visited Stanley in jail the day after he was arrested. He was so out of it that he barely recognized me. He was dazed and did not appear to know why he was in jail. I was present at his arraignment. He was giggling like a child throughout the hearing.... It was just so obvious that Stanley wasn't all there.

I visited [petitioner] every day while he was awaiting trial, and I know that he did not come to his senses and start acting normally until some time during the middle of his trial. I could tell that the old Tookie was trying to come back when towards the end of his trial, he finally started trying to pay attention as best he could and trying to ask his lawyers a few questions.

(Opp.Ex.10, ¶¶ 12–14.)

### vi. Declaration of Joseph McFarland

McFarland was in the same section of the jail as petitioner while he was on trial. McFarland stated that petitioner was "childish and naive." The prison guards would bring him cookies and in exchange he would flex his muscles and break out of handcuffs. McFarland stated that it was not normal for a black prisoner to fraternize with white guards, and that "it was

obvious to me from the first time I met [petitioner] that he was PCP dazed." (Opp.Ex.42, ¶ 5.) McFarland also stated that petitioner "did not seem to comprehend the seriousness of the charges against him. He told me that the police had arrested the wrong person, and that it would be cleared up within a matter of days." (Opp.Ex.42, ¶ 6.)

### vii. Declaration of Tony Sims

Sims was petitioner's co-defendant in the Owens murder. He stated that he had known petitioner for eight years before the murders. He saw petitioner on a prison bus when they were being transported to court, but petitioner did not recognize him. As petitioner approached the bus, "he stopped abruptly and turned around in circles about five or six times. The deputy stepped back and let him complete his circles. It was very strange. On the bus, he just sat zombie-like, and stared straight ahead, not reacting to anything or anyone around him." (Opp.Ex.50, ¶ 7.)

### viii. Declaration of Bonnie Taylor

Taylor was married to petitioner from 1972 to 1974. In her declaration, she discussed his drug use, harassment by the police, and general character. She visited him once in jail. She stated that he "acted very silly and immature, as if he had no clue where he was, or what he was facing." (Opp.Ex.57, ¶ 11.)

### ix. Declaration of Ceola Williams

Ms. Williams is petitioner's mother. In her declaration, she discussed petitioner's background and childhood, including his head injuries and drug use. She also stated that, when she visited him in jail, he was "dazed and confused, and on several occasions, did not recognize me or my husband Fred Holiwell. Mentally, he was far, far away. Often he was unable to answer even simple questions such as 'How are you?', seeming not to understand. When he would answer, he would often lose his train of thought before finishing. He had no idea why he was in jail,

and at times seemed even unaware that he was in jail." (Opp.Ex.60, ¶ 13.)

x. Declaration of Sherry Wiseman

Wiseman was an alternate juror on petitioner's case. She stated that petitioner "seemed 'spaced out' and not all there. He looked to me as if he was on drugs.... Although once in a while he made comments to his lawyers when witnesses were testifying, most of the time he did not look at the witnesses or make eye contact with anyone in the courtroom. He seemed oblivious to what was going on and in another world." (Opp.Ex.63, ¶ 2.)

b. *Merits of Petitioner's Substantive Incompetence Claim*

The evidence submitted in support of petitioner's claim is not trivial. Declarations from witnesses who knew him well state that he was "dazed and confused," "out of it," "spaced out," and "had no clue where he was or what he was facing." Petitioner's stepfather informed the state court judge that he thought petitioner needed psychiatric assistance. (1 RT A–18.) Petitioner was hospitalized for at least one day after a psychotic episode during which he took off all his clothes and ran down the street screaming. Although this episode was determined to be drug-induced, it is evidence of mental problems, and evidence was presented at trial that petitioner had been ingesting drugs around the time of the murders. Petitioner has submitted declarations from three mental health experts stating that they believe that as a result of mental illness, frontal lobe damage, chronic and excessive drug abuse, and head injuries, petitioner was not competent to stand trial. There is evidence in the state court record that petitioner did not immediately respond to the court during a pre-trial hearing. Although Dr. Coodley stated that petitioner was competent to stand trial, according to Dr. Coodley's 1995 declaration, he was not provided with all of the relevant information about petitioner's family's mental illness, his head injuries, his drug abuse, and his frontal lobe damage. Dr. Coodley stat-

ed that this additional information would have changed his views regarding petitioner's competency. Taken as a whole and without addressing the credibility of the witnesses who provided the declarations, petitioner has presented some evidence that he was incompetent at trial.

On the other hand, there is substantial evidence tending to show that petitioner was competent at trial. There is no indication in the record that petitioner behaved inappropriately during trial. He did not act out or disrupt the proceedings. Defense counsel did not raise the issue of his competency, nor did the trial judge or deputy district attorney. The only contemporaneous evaluation done of petitioner concluded that he was competent. The mental health evaluations submitted by petitioner to this Court were based on interviews conducted ten years after the trial. Petitioner addressed the state court at least twice during the state court proceedings and appeared to understand the proceedings against him. (1 RT A–56; 12 RT 2988.) He was sufficiently aware of his surroundings to request a continuance to have his retained counsel present. Petitioner also appeared rational during questioning by police. (See Opp.Ex. 80.)

The Court is inclined to find that the facts alleged by petitioner do not create a real and substantial doubt about his competency. However, since the Court has already ordered an evidentiary hearing on other claims and trial counsel will be appearing to give testimony, the parties may explore this issue with trial counsel. If his responses create additional concerns, the Court will consider granting an expanded hearing on this issue.

**Claim B: Shackling and Excessive Security**

Petitioner argues that his constitutional rights were violated because he was subjected to excessive security and shackling without permissible justification and necessity, and in the absence of a hearing thereon. (Pet. at 15.) In support of this claim,

petitioner argues that his hands were shackled during trial, that the shackles were visible to jurors and spectators, and that an unusual number of deputy sheriffs were present in the courtroom during the trial. He also alleges that his attorney was deficient in failing to object to the physical restraints and excessive security.

One of the jurors in petitioner's trial stated in a declaration that petitioner "was handcuffed from the beginning of trial until its end. I recall the handcuffs because I remember wondering how they could find cuffs which could fit around his wrists. I could see these restraints whenever Mr. Williams' hands were visible." (Opp.Ex.37, ¶ 2.) An alternate juror stated in a declaration that "[d]uring Mr. Williams' trial there were generally four marshals in the courtroom; one near Mr. Williams, one near the jury, and one on each side of the gate from the spectators section." (Opp.Ex.63, ¶ 5.).

### 1. Shackling

A criminal defendant has a constitutional right to appear before a jury free of restraints such as shackles. *Jones v. Meyer*, 899 F.2d 883, 884 (9th Cir.1990) (quoting *Spain v. Rushen*, 883 F.2d 712, 716 (9th Cir.1989)). This right is grounded both on the presumption of innocence and due process grounds. *Duckett v. Godinez*, 67 F.3d 734, 747–48 (9th Cir.1995), *cert. denied*, 517 U.S. 1158, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996). The use of restraints has several inherent disadvantages: physical restraints may cause jury prejudice and impair the presumption of innocence; they may detract from the dignity and decorum of the courtroom; they may impede the defendant's ability to communicate with his counsel; they may confuse and embarrass the defendant; and they may cause pain. *Id.*

The right to appear before a jury free of shackles is not absolute. Shackling is inherently prejudicial, but it is not per se unconstitutional. *See Rushen*, 883 F.2d at 716. Under certain circumstances,

" 'shackling ... may be appropriate because of the public's competing interest in courtroom security and the just administration of law.' " *Duckett*, 67 F.3d at 748 (quoting *Rushen*, 883 F.2d at 722). However, "it is a denial of due process if a trial court orders a defendant shackled without first engaging in a two-step process. First, the court must be persuaded by compelling circumstances that some measure is needed to maintain security of the courtroom. Second, the court must pursue less restrictive alternatives before imposing physical restraints." *Id.* at 748 (quotations and citations omitted).

There is no information in the state court record regarding petitioner's shackling. There is no indication that the issue was ever discussed by counsel and the trial court. There is no record that the court ordered petitioner to be shackled or that trial counsel objected to the shackling. Consequently, the trial court did not articulate its reasons for allowing petitioner to remain shackled and there is no indication whether any less restrictive alternatives were available and would have been adequate.

The trial court is not required to state on the record all its reasons for imposing shackles, nor must it conduct a hearing on the necessity before ordering the use of physical restraints. *Duckett*, 67 F.3d at 749 n. 7. However, "the basis for the decision to shackle should be apparent from the record. If it is not, the [federal habeas court] must hold an evidentiary hearing to determine whether shackling was justified." *Id.*

It is impossible to tell from the record before the Court whether the shackling was justified. Respondent argues that the court had several reasons for shackling petitioner, including his massive size, the fact that he founded the notorious street gang, the Crips, and his escape plan. However, respondent cites no case supporting his argument that a defendant may be shackled because he is a bodybuilder or

is physically large. The mere fact that petitioner is a gang member, or the leader of a gang, does not establish that he will be a security problem. It is not even clear that the trial court knew that petitioner was the alleged founder of the Crips. In each Ninth Circuit case in which shackling has been approved, "there has [ ] been evidence of disruptive courtroom behavior, attempts to escape from custody, assaults or attempted assaults while in custody, or a pattern of defiant behavior toward corrections officials and judicial authorities." *Duckett,* 67 F.3d at 749 (citing *Morgan v. Bunnell,* 24 F.3d 49, 51 (9th Cir.1994); *Hamilton v. Vasquez,* 17 F.3d 1149, 1154–55 (9th Cir.1994); *United States v. Baker,* 10 F.3d 1374, 1401 (9th Cir.1993); *King v. Rowland,* 977 F.2d 1354, 1358 (9th Cir. 1992); *Jones,* 899 F.2d at 885; *Stewart v. Corbin,* 850 F.2d 492, 498 (9th Cir.1988); *Wilson v. McCarthy,* 770 F.2d 1482, 1485 (9th Cir.1985)). With the exception of the escape plan, none of these appear to be present in Williams's case.

Attempted escapes while in custody are clearly relevant. *Morgan,* 24 F.3d at 51. However, there is no evidence that petitioner's escape ideas went beyond the planning stage and, until Oglesby testified about the escape plans at the end of the guilt phase, it is not clear that the trial court was aware of the escape plans. In addition, Oglesby testified that the escape plan ended over a year and a half prior to trial. Therefore, the basis for the shackling is not apparent from the record, and it is impossible to say that petitioner's shackling was appropriate or justified.

The remaining question is whether the error, if any, had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Given the inadequacy of the record, it is impossible to resolve that issue on summary judgment. Although the effect of shackles has been described as inherently prejudicial, the actual prejudice will vary depending on the degree of restraint. *See, e.g., Castillo v. Stainer,* 983 F.2d 145, 149 (9th Cir.1992), *modified,* 997 F.2d 669 (9th Cir.1993) (holding shackling at trial harmless because the defendant wore only a waist chain which could not be seen by the jury.) To determine whether petitioner suffered prejudice, the Court must determine "how onerous the shackles were" and the "extent to which they were visible by the jury." *Duckett,* 67 F.3d at 749.

Based on the foregoing, the Court DENIES summary judgment on this portion of the claim and the shackling claim will be subject to the evidentiary hearing already scheduled in this case.

### B. Excessive Security

██ Petitioner also alleges that the presence of four uniformed deputy sheriffs at trial prejudiced the jury. The deployment of security personnel during trial is not the sort of "inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest." *Holbrook v. Flynn,* 475 U.S. 560, 568–69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). On federal habeas review, a federal court "is not to determine whether it might have been feasible for the State to have employed less conspicuous security measures in the courtroom. . . . All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Id.* at 572, 106 S.Ct. 1340.

██ Respondent has established that he is entitled to relief as a matter of law on the excessive security portion of this claim. The only evidence petitioner has alleged to support this claim is an alternate juror's declaration that there were four deputy sheriffs in the courtroom during his trial, instead of the usual two. The Court as-

sumes this allegation is true. However, the use of four deputies, by itself, is not sufficient to establish a denial of the right to a fair trial. *Holbrook,* 475 U.S. at 572, 106 S.Ct. 1340 (presence of four uniformed state troopers held constitutional); *King v. Rowland,* 977 F.2d 1354, 1358 (9th Cir. 1992) (use of three deputy sheriffs to guard defendant held constitutional); *Ainsworth v. Calderon,* 138 F.3d 787, 797 (9th Cir.1998) (use of four, and sometimes six, deputy sheriffs held constitutional). Petitioner does not allege that the presence of the two additional deputies impaired his ability to have access to his attorney or to assist in his defense. Moreover, there is no evidence to suggest that the jurors knew that additional security personnel were being used. In her declaration, alternate juror Wiseman stated that she knew that there were usually only two deputies present during trial because her brother was a marshall. (Opp.Ex.63, ¶ 5.) There is no evidence that any other juror was aware that only two deputies were normally used. Therefore, there is no reason to conclude that the presence of four deputies denied petitioner a fair trial.

Because the use of additional security measures is not inherently prejudicial, the State is not required to justify its decision to deploy two additional deputies. *Morgan,* 946 F.2d at 1465. Therefore, the trial court's failure to hold a hearing on the issue of the additional security does not change the analysis.

Based on the foregoing, the Court GRANTS summary judgment on this portion of Claim B.

## Claim C: Racial Animus in Jury Selection and Prosecution

Petitioner argues that his constitutional rights were denied by the prosecutor's use of peremptory challenges to remove all African–American women from the jury and to remove an African–American male alternate juror and by the prosecutor's "thinly-veiled appeal to racial prejudice during the penalty phase of trial." (Pet. at 16.)

### 1. *Batson Claim*

■■■■ To prevail on a claim under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), petitioner must establish a prima facie case of purposeful discrimination in the jury selection process. To establish a prima facie case, he must show that "(1) the defendant is a member of a cognizable racial group; (2) the prosecution has removed members of such a racial group; and (3) circumstances raised an inference that the challenges were motivated by race." *Turner v. Marshall,* 63 F.3d 807, 812 (9th Cir.1995). Once he has established a prima facie case, the burden then shifts to the prosecutor to present a race-neutral explanation for the use of the peremptory challenges. If a race-neutral explanation is tendered, the trial court must decide whether petitioner has proved purposeful discrimination. *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Although it was not decided until several years after petitioner's trial, *Batson* applies retroactively to cases—like petitioner's—that were pending on direct appeal at the time it was decided. *Griffith v. Kentucky,* 479 U.S. 314, 326–28, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

### a. *Trial Counsel's Failure to Object*

Respondent argues that summary judgment should be granted because petitioner's trial counsel failed to object to the prosecutor's use of peremptory challenges at trial, therefore, petitioner did not establish a prima facie case of purposeful discrimination. Petitioner argues that counsel's failure to object is not fatal to his claim, and, if it is, the Court has discretion to excuse such failures in the interests of justice.

■■■■ An objection based on *Batson* should be made as soon as possible. *See United States v. Contreras–Contreras,* 83 F.3d 1103, 1105 (9th Cir.), *cert. denied,* 519 U.S. 903, 117 S.Ct. 259, 136 L.Ed.2d 184 (1996). Even assuming it does not bar

review of the claim, the failure to object and consequently to perfect a record makes appellate review of the prosecution's use of peremptory challenges difficult if not impossible. A "contemporaneous objection is especially pertinent as to *Batson* claims, where innocent oversight can so readily be remedied and an accurate record of the racial composition of the jury is crucial on appeal." *United States v. Pulgarin*, 955 F.2d 1, 2 (1st Cir.1992). Unless the facts supporting the *Batson* claim are articulated at trial, "they are lost to the record and appellate review becomes impossible." *United States v. Changco*, 1 F.3d 837, 840 (9th Cir.1993). The " 'decision to exercise a peremptory challenge ... is subjective; and, often, the reasons behind that decision cannot be reasonably articulated.' " *McCrory v. Henderson*, 82 F.3d 1243, 1247 (2nd Cir. 1996) (quoting *Thomas v. Moore*, 866 F.2d 803, 805 (5th Cir.1989)). The trial judge must rule on whether the prosecutor's justifications for the challenges are legitimate or are a subterfuge for discrimination. Given the often subtle reasons for the exercise of peremptory challenges, the trial court's ruling on the *Batson* claim may turn on the court's observations of the prospective jurors and the prosecutor. *Id.* at 1248.

 Neither the Ninth Circuit nor United States Supreme Court has squarely addressed the issue of how to resolve a *Batson* claim where trial counsel failed to object.[4] The Ninth Circuit has noted in *dicta* that "the defendant whose counsel fails to make a timely objection to a peremptory challenge merely forfeits the right to object and may argue on appeal that the peremptory challenge constituted plain error." *Contreras–Contreras*, 83 F.3d at 1105 n. 1. Plain error is an actual error that is "clear" and "obvious" under

current law. *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). When plain error affects "substantial rights" the court has the authority to exercise its discretion in reversing a conviction. *Id.* at 732–37, 113 S.Ct. 1770. A plain error affects substantial rights when the error was prejudicial in that it "affected the outcome of the [trial court] proceedings." *Id.* at 734, 113 S.Ct. 1770. "It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id.* The discretion to correct the error should be used only in those cases " 'in which a miscarriage of justice would otherwise result.' " *Id.* at 736, 113 S.Ct. 1770 (quoting *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

*Contreras–Contreras* was a direct appeal case, not a habeas case. As the United States Supreme Court has noted, "[f]ederal habeas challenges to state convictions ... entail greater finality problems and special comity concerns. We remain convinced that the burden of justifying federal habeas relief for state prisoners is 'greater than the showing required to establish plain error on direct appeal.' " *Engle v. Isaac*, 456 U.S. 107, 134–35, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977)). Therefore, to prevail on this claim, petitioner must make a showing greater than that required to show plain error on direct appeal.

 Assuming petitioner has not waived this claim by failing to object at trial, he has failed to establish that the prosecutor's use of peremptory challenges constitutes plain error and has thus failed to meet the greater burden of showing that he is entitled to federal habeas relief. Petitioner has failed to make a prima facie

---

4. Other circuits have found the failure to object fatal to a *Batson* claim. *See, e.g., Andrews v. Collins*, 21 F.3d 612, 621 (5th Cir.1994); *Ruff v. Armontrout*, 77 F.3d 265, 267 (8th Cir.1996); *McCrory*, 82 F.3d at 1249 (2nd Cir.1996), and the Supreme Court has noted

that a requirement that *Batson* claims be raised between the selection of the jurors and administration of their oaths is "a sensible rule." *Ford v. Georgia*, 498 U.S. 411, 422, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991).

showing of purposeful discrimination. He has failed to show that the "circumstances raised an inference that the challenges were motivated by race." *Turner*, 63 F.3d at 812. He has failed to allege how many jurors the prosecutor struck with a peremptory challenge, how many of those jurors were African–American, how many of the jurors in the venire were African–American, and how many African–American jurors actually sat on his jury. He has also failed to allege facts showing that the African–American jurors were struck for an improper reason, and has failed to show that the prosecutor did not have a valid, race-neutral reason for striking the African–American jurors. In view of petitioner's failure to present evidence to meet his burden, the Court GRANTS summary judgment on the *Batson* claim.

### c. *Ineffective Assistance of Counsel*

■■■ Petitioner claims his trial attorney provided ineffective assistance by failing to object to the prosecutor's use of peremptory challenges to exclude potential African–American jurors. To prevail on a claim of ineffective assistance of counsel, petitioner must show that (1) his attorney's performance was deficient, and (2) prejudice resulted from the attorney's acts or omissions. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Deficient performance requires a showing that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. 2052. In reviewing his performance, great deference should be afforded counsel's tactical decisions. Prejudice requires a showing of a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is defined as one that is sufficient to undermine confidence in the outcome. *Id.* at 694, 104 S.Ct. 2052.

■■■ The first issue is whether trial counsel could have provided ineffective assistance by failing to raise an objection based on a case that had not been decided at the time of petitioner's trial. Petitioner was tried in 1981; *Batson* was not decided until 1986. Normally, counsel "need not 'anticipate a change in existing law' to render constitutionally effective assistance of counsel." *Carter v. Hopkins*, 92 F.3d 666, 670 (8th Cir.1996) (quoting *Ruff v. Armontrout*, 77 F.3d 265, 268 (8th Cir. 1996)). However, petitioner's attorney could have raised the issue on state law grounds. *People v. Wheeler*, 22 Cal.3d 258, 272, 148 Cal.Rptr. 890, 583 P.2d 748 (1978). Similarly, the attorney could have raised an objection to the exclusion of non-white jurors under existing federal law. *See Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *cf. Ford v. Georgia*, 498 U.S. at 425, 111 S.Ct. 850 (holding that defendant tried before *Batson* decided who raised contemporaneous objection to jury selection based on *Swain* also preserved *Batson* claim for review on direct appeal). Therefore, trial counsel could conceivably be found deficient for failing to object to the prosecutor's discriminatory use of peremptory challenges.

■■ Even assuming trial counsel could have provided deficient performance, the ineffective assistance of counsel subclaim suffers from the same infirmities as the *Batson* claim. Given the strong presumption that trial counsel provided effective representation, petitioner will be unable to show that his attorney provided deficient performance or that he suffered prejudice from the failure to object. He has failed to establish that any reasonable attorney under the circumstances would have objected to the prosecution's use of peremptory challenges and cannot establish that the objection would have been sustained. Therefore, the Court GRANTS the motion for summary judgment as to the ineffective assistance subclaim.

### 2. *Prosecutorial Misconduct*

Petitioner argues that his constitutional rights were violated when the prosecutor made a racist analogy during his closing argument.

During his penalty phase closing argument, the prosecutor argued:

I'm going to close with an analogy. As I say, an analogy sometimes takes up from the familiar to the unfamiliar. As if we were to take a friend, a wife, a visitor from out of town down to San Diego and perhaps go to Mission Bay and perhaps go to the zoo; and if we went to the zoo, we might pass a place that had a high fence and a moat; and in the background you would see, sleepily, really, striped animals, mother, father, maybe some cubs sunning themselves in the shade while we stood there perhaps eating a candy bar or something looking at them. And there's a little brass plate, and it says, "Bengal Tiger." And you tell your friends or your children that that's a Bengal Tiger, when, as a matter of fact, it is not a Bengal Tiger.

Why do I say that? The same reason that all during this trial you have seen the defendant, Stanley Williams, sitting there in his suit, coming into court each day. We're seeing him in a sanitized atmosphere in a courtroom, the judge with a jury, the spectators, bailiff, defense attorneys, prosecutor, all in suits and ties. Very civilized proceeding.

And, so, if you were to take your wife and those same children or a visitor out of town and go to India and there take a trip into the back country, into the hinterlands; and you have a pack on, and you're walking through palm tree and scrub brush; and suddenly you push a large palm aside and as you do so, you see flashing bright eyes of a mother Bengal Tiger with her cubs. Now, you are seeing a Bengal Tiger.

This is not the San Diego Zoo. This is you in the habitat, in the environment. And, by the same token, as we look at the evidence from the 7–11, we look at the evidence from the Brookhaven Motel, that as the defendant—there's the defendant. There's the defendant in his environment, with his shotgun, killing people unnecessarily for a pittance of money.

(12 RT 3043–44.)

Respondent argues that he is entitled to summary judgment because the state supreme court's rejection of a similar claim in another case is a finding of fact entitled to a presumption of correctness.

Pursuant to 28 U.S.C. § 2254(d), a state court's written findings of fact made after a hearing on the merits of a factual issue are presumed to be correct unless petitioner establishes one of eight exceptions. However, respondent's argument has two problems. First, the state court's decision in *People v. Duncan,* 53 Cal.3d 955, 281 Cal.Rptr. 273, 810 P.2d 131 (1991), regarding a similar argument made by the same prosecutor who tried petitioner's case, is not a finding of fact entitled to a presumption of correctness. Respondent has cited no authority for the proposition that a federal court may presume correct findings of fact made by a state court in another case and thereby deny petitioner federal habeas relief. Second, the underlying facts of the prosecutorial misconduct claim are undisputed and do not need to be "found." The prosecutor made a closing argument which was transcribed and included in the state court record. The state supreme court's decision relating to the closing argument in *Duncan* was not a finding of fact, but rather a characterization of the argument.

 However, in the alternative, respondent argues that the Court should grant summary judgment because the prosecutor's argument was harmless. The Court has independently reviewed the argument made by the prosecutor at the guilt phase of petitioner trial and finds that the argument did not so infect "the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The prosecutor's argument was not overly inflammatory. He was merely trying to show that petitioner's appearance and de-

meanor in court was not inconsistent with his violent behavior on the night of the murders. Using the analogy of a caged predator versus a wild one to illustrate this point does not invoke racial overtones. In addition, the Ninth Circuit recently denied an almost identical claim. *McDowell v. Calderon*, 107 F.3d 1351, 1365 (9th Cir. 1997), *overruled on other grounds*, 130 F.3d 833 (9th Cir.1997) (en banc). Based on the foregoing, the Court finds that the prosecutor's argument did not render the sentencing phase fundamentally unfair and GRANTS summary judgment on this claim.

### Claim D: Trial Counsel's Failure to Present a Mens Rea Defense

Petitioner claims his trial attorney failed to investigate and present evidence that he lacked the requisite mens rea for murder and robbery due to his serious mental disorder and/or drug-induced psychosis or intoxication due primarily to the combined effects of his underlying organic affective disorder and chronic use of mind altering drugs.[5]

■ Respondent argues that he is entitled to summary judgment on this claim for the following reasons: (1) trial counsel's decision to present an alibi defense instead of a diminished capacity defense cannot be considered deficient performance, and (2) petitioner suffered no prejudice from counsel's failure to present a diminished capacity or insanity defense because it would not have succeeded. (Mot. at 116–157.)

At trial, petitioner's attorney presented an alibi defense. A mental state defense would have contradicted this defense by conceding petitioner's presence at the scenes of the murders. The Ninth Circuit recently held that a habeas petitioner was not entitled to an evidentiary hearing on a similar claim. *Correll v. Stewart*, 137 F.3d 1404 (9th Cir.1998). The circuit held that "it was within the broad range of professionally competent assistance for [petitioner's] attorney to choose not to present psychiatric evidence which would have contradicted the primary defense theory." *Id.* at 1411. Therefore, the Court GRANTS respondent's motion as to this claim.[6]

### Claim E: Samuel Coleman's Coerced Statement

Petitioner contends that his constitutional rights were violated by the admission of the illegally coerced and involuntary testimony of a key prosecution witness, Samuel Coleman.[7] Coleman and petitioner were arrested while driving in Coleman's car. Coleman was arrested for carrying a loaded shotgun in the trunk of his car and petitioner was arrested for the 7–Eleven and Brookhaven Motel murders. Petitioner alleges that the police beat Coleman then offered him immunity to testify against petitioner, and that Coleman agreed to testify because he feared further physical abuse.

#### 1. *Coleman's Trial Testimony was not Coerced*

At trial, Coleman testified that he and petitioner were acquaintances and that he saw petitioner at around 2 a.m. on March 11, 1979, at the Showcase Bar. The next

---

5. Petitioner does not oppose respondent's motion for summary judgment as to his free-standing legal innocence claim, and, assuming the claim is cognizable, petitioner has failed to make the extraordinary showing of innocence required to obtain relief on the freestanding claim.

6. Petitioner is still entitled to present evidence regarding his mental impairments in support of his claim that trial counsel failed to present mitigating evidence. (See discussion of Claims Q and R below).

7. Petitioner did not waive this claim at trial. At trial, both sides agreed that they would not ask Coleman any questions regarding his arrest, and that they would not discuss any weapons that might have been in the automobile at the time of the arrest. (7 RT 1548–49.) This is clearly a different subject than whether the police beat Coleman to force him to inculpate petitioner.

day they walked their dogs together in Griffith Park. While at the park, petitioner told Coleman that he had robbed and killed some people and that he was going to use the proceeds of the robbery to buy PCP. (7 RT 1563.)

■ In general, petitioner does not have standing to challenge an alleged violation of Coleman's constitutional rights. However, "[c]onfessions wrung out of their makers may be less reliable than voluntary confessions, so that using one person's coerced confession at another's trial violates his rights under the due process clause." *Clanton v. Cooper,* 129 F.3d 1147, 1158 (10th Cir.1997) (quoting *Buckley v. Fitzsimmons,* 20 F.3d 789, 795 (7th Cir. 1994)). The Ninth Circuit caselaw appears to follow this analysis. *See United States v. Mattison,* 437 F.2d 84, 85 (9th Cir.1970).

Although petitioner's claim is cognizable, he has failed to allege facts sufficient to entitle him to relief. For the purposes of this analysis, the Court assumes that Coleman's claim that he was beaten by police is true. Under *Mattison,* petitioner must establish that the third party witness's trial testimony was coerced. *Mattison,* 437 F.2d at 85. As the court in *Mattison* noted, "[b]y the time of trial, the psychologically coercive atmosphere of that interrogation must have dissipated. There is no indication that [the witness] was told at any time by anyone what he should say on the witness stand." *Id.* The court also pointed out that the witness's testimony was subject to cross-examination and that the jury could observe his demeanor and gauge his credibility.

■ Petitioner's claim suffers from the same infirmities as the claim in *Mattison.* Even assuming the police beat Coleman and forced him to inculpate petitioner when he was arrested in 1979, by the time he testified in 1982, the coercive atmosphere of the interrogation had dissipated. Coleman had a lawyer, who, according to Coleman's testimony at trial, negotiated the grant of immunity which Coleman received from the prosecution in exchange for his testimony. (7 RT 1554.) The grant of immunity was unnecessary because Coleman was never charged with any crime and the prosecution never alleged that he was involved in the murders. Coleman was represented and the police had nothing to hold over his head at trial. According to Coleman's declaration, petitioner was aware that Coleman had been beaten by the police, and trial counsel was free to interview Coleman about his treatment by police. (Opp.Ex.19, ¶ 3.) Petitioner had the opportunity to cross-examine Coleman about petitioner's statements to him and could have inquired about the alleged beating. In addition, the jury was given the appropriate instructions as to reasonable doubt, credibility, and immunity to aid them in assessing the value of Coleman's testimony. Therefore, the admission of Coleman's trial testimony did not violate petitioner's due process rights.

### 2. *Any Error in the Admission of Coleman's Testimony was Harmless*

Respondent also argues that he is entitled to summary judgment on this claim because any error in the admission of Coleman's trial testimony was harmless because his testimony was corroborated by the testimony of other witnesses. Petitioner argues that the error was not harmless because Coleman was the only witness who was not an accomplice, inmate, or career criminal.

■ Corroboration of the alleged coerced testimony of a third party witness from other sources can demonstrate the reliability and nonprejudicial impact of the testimony. *Wilcox v. Ford,* 813 F.2d 1140, 1149 (11th Cir.1987). In this case, Coleman's testimony was corroborated by the testimony of James and Esther Garrett, George Oglesby, and by the testimony of a firearms expert that a shotgun shell casing found at the scene was fired from petitioner's shotgun. Although Coleman's testimony may have been more believable be-

cause he was not an accomplice, career criminal, or jail inmate, this difference was not so significant that the introduction of his testimony denied petitioner a fair trial. The admission of Coleman's testimony at trial, assuming it was error, did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710. Based on the foregoing, the Court GRANTS summary judgment on this claim.

## Claim F: Prosecution's Suppression of Material Evidence Regarding James Garrett

Petitioner claims that, contrary to James Garrett's testimony at trial, the District Attorney's Office made promises to assist him in the receiving stolen property and extortion cases for which he was awaiting sentencing at the time of petitioner's trial in exchange for his testimony against petitioner. (Pet. at 31–32.) Respondent argues that he is entitled to summary judgment on this claim because petitioner has failed to allege facts proving the existence of an agreement and that any agreement was not material.

■■■ The prosecution has a duty to turn over all exculpatory evidence to the defense. The Supreme Court held in *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates Due Process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." Later, the Supreme Court expanded the scope of the rule, holding that "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, disclosure is only required when the evidence is material. Evidence is material if "there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

### 1. Petitioner has Failed to Establish an Undisclosed Agreement Between Garrett and the Prosecution

■■■ Respondent argues that a claim of failure to disclose exculpatory evidence cannot be based on speculation, and, since petitioner has presented no evidence of an actual agreement that Garrett would receive leniency in exchange for testifying at petitioner's trial, respondent is entitled to summary judgment on this claim.

Petitioner argues that he has alleged a "vast body of circumstantial evidence establishing that the Garretts obtained an undisclosed deal." (Opp. at 148.) Petitioner's position is summarized as follows: before petitioner's trial Garrett pled guilty to receiving stolen property and to compounding a felony; at petitioner's trial Garrett testified that he had not been sentenced on these two charges, that he had not been promised anything regarding those two charges, and that he had been told that he would spend a year in county jail; the prosecutor in petitioner's case then talked to Garrett's sentencing judge before Garrett was sentenced; and, as a result of the prosecutor's comments to Garrett's judge, Garrett was sentenced to probation. Petitioner argues that this chain of events proves that an undisclosed deal must have existed.

The inference could be made based on the information identified by petitioner that the prosecution told Garrett that he would get probation if he testified against petitioner and that neither Garrett nor the prosecutor disclosed this deal to petitioner. However, petitioner has not established that such a deal actually existed. Based on the evidence before the Court, it is equally likely that, after Garrett testified and without any prior agreement, the prosecutor agreed to talk to the judge in

Garrett's case about Garrett's assistance. It was not necessary for a "deal" to be in place for the prosecutor to agree to assist Garrett. Under those circumstances, Garrett's testimony at trial would have been accurate. Garrett testified that he hoped to receive additional benefits from his testimony against petitioner. His hope and expectation may have come to fruition. The mere fact that Garrett received a reduced sentence does not necessarily mean that an undisclosed deal existed between Garrett and the prosecutor. Petitioner's argument is based on inference and speculation.

### 2. *The Alleged Undisclosed Deal was not Material*

Even if petitioner could show that Garrett obtained undisclosed benefits, he must still establish that the undisclosed evidence was material. A conviction may be set aside for the failure to disclose exculpatory evidence only where the undisclosed evidence is material, i.e., where a reasonable probability exists that, had the evidence been disclosed, the result at trial would have been different. Petitioner may show a Brady violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

In the instant case, if the prosecution had disclosed the alleged fact that they agreed to ask Garrett's sentencing judge to sentence him to probation, there is no reasonable probability that the result at trial would have been different. Defense counsel did a good job of attacking Garrett's credibility. During his testimony, Garrett admitted that he had been convicted of armed robbery in 1970 (7 RT 1651); he admitted that he pled guilty to receiving stolen property and to compounding a felony in two different cases (7 RT 1649); that his pleas had been made pursuant to a plea bargain and that he had been told that he would receive a year of county jail time in each case (7 RT 1649–72); that he had offered information regarding petitioner's involvement in the Brookhaven Motel murders in hopes of getting a benefit with respect to the charges pending against him (7 RT 1657, 1670–72); he described how he had staged accidents to collect on insurance claims under various assumed identities; he testified that he was told his wife would be given three years probation for her role in the receiving stolen property case if he testified against an attorney and doctor in the insurance fraud cases (7 RT 1650–51); that he then tried to extort money from the attorney in exchange for providing favorable testimony in his case (7 RT 1668); and that neither he nor his wife had been sentenced for the crimes to which they plead guilty (8 RT 1740–41). Defense counsel showed Garrett to be a thief and a con man who lied, cheated, and stole to benefit himself. His background, character, potential motive for lying, and hope that he would obtain additional benefits in the future were all disclosed to the jury. The addition of one more inducement or promise of leniency relating to his convictions would not have given the jury a different picture of James Garrett. Therefore, the prosecution's failure to disclosed the alleged agreement would not, with reasonable probability, have changed the result of the underlying proceeding, and the Court GRANTS the motion for summary judgment as to this claim.

### Claim G: Improper Admission of Testimony of Informant Oglesby

Petitioner argues that his constitutional rights were violated by the admission of the testimony of "governmental agent informer George Oglesby regarding petitioner's 'admissions' and 'confessions' made in jail after petitioner was charged and awaiting trial." (Pet. at 32.) Respondent argues that he is entitled to judgment as a matter of law on this claim because the state supreme court denied the claim after holding two evidentiary hearings on the issue and the state court's decision and the findings of fact underlying that decision

are entitled to a presumption of correctness in federal court. Petitioner argues that the presumption of correctness does not apply because he did not receive a full and fair hearing on this claim in state court.

At trial, George Oglesby testified to admissions and escape plans made by petitioner while they were housed in the same cell block over a year before petitioner's trial. The trial court's admission of this testimony was the subject of two evidentiary hearings held by a specially appointed referee in state court and resulted in two California Supreme Court opinions, *Williams I*, 44 Cal.3d 1127, 245 Cal.Rptr. 635, 751 P.2d 901 (1988), and *Williams II*, 7 Cal.4th 572, 29 Cal.Rptr.2d 64, 870 P.2d 1072 (1994).

The first hearing in 1985 resulted in findings by the California Supreme Court that, under the then-recently decided *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), no Sixth Amendment violation occurred because petitioner did not establish that Oglesby acted as anything more than a "listening post." *Williams I*, 44 Cal.3d at 1127, 245 Cal.Rptr. 635, 751 P.2d 901. However, petitioner's counsel were later able to uncover more evidence about Oglesby and his activities, including, that Lt. Fitzgerald had previously used Oglesby as an informant; the relationship between Oglesby and Leslie White, a notorious jailhouse informant; a tape-recorded conversation between Oglesby and White; another tape recording of a conversation between White and investigators for the District Attorney's Office; testimony by White indicating how false confessions were obtained by jailhouse informants; testimony by White that he had placed the offices of the Los Angeles District Attorney and California Attorney General on notice of the dangers of jailhouse informant testimony as early as 1979; and a declaration from White stating that Oglesby had admitted that he had perjured himself in petitioner's trial by putting together a story about petitioner to get a better deal for himself.

After the presentation of this evidence in petitioner's third state habeas petition, the California Supreme Court issued an order to show cause why petitioner's death sentence should not be vacated. *Williams II*, 7 Cal.4th at 579, 29 Cal.Rptr.2d 64, 870 P.2d 1072. The state court ordered a second evidentiary hearing and appointed the same referee, Judge Egly, who had served as the referee in the first hearing. The second hearing was held in 1992.

Petitioner intended to have several jailhouse informants testify at the second evidentiary hearing, including Oglesby and Leslie White. However, because the informants did not testify, the second hearing consisted primarily of the testimony of the two officers involved, Fitzgerald and Allender. Oglesby died the night before the hearing and the rest of the witnesses, including White, invoked their Fifth Amendment right not to incriminate themselves and declined to testify. *Williams II*, 7 Cal.4th at 579, 29 Cal.Rptr.2d 64, 870 P.2d 1072. Petitioner asked the referee to grant the witnesses use immunity so that they could testify at the hearing, but the motion was denied.

After the second hearing, the referee made the following findings: (1) neither the State nor any of its agents employed Oglesby to elicit any confession or admission from petitioner before May 21–22, 1979, and (2) the State actively solicited, directed, and aided Oglesby to obtain through solicitation of petitioner additional information as to petitioner's escape plans after the initial disclosure by Oglesby to the authorities on May 21, 1979. *Williams II*, 7 Cal.4th at 593, 29 Cal.Rptr.2d 64, 870 P.2d 1072. Evidence introduced as a result of conversations between petitioner and Oglesby before May 21, 1979, included: a conversation between Oglesby and petitioner about guns, petitioner's confession to Oglesby that he committed the murders at the motel, and the escape plan. Evidence presented as a result of conver-

sations after May 21 included: a threat by petitioner to kill Alfred Coward; modification of the escape plan to include killing the guards on the bus, killing Coward, and blowing up the bus to make it difficult for the authorities to determine who escaped; and additional notes refining and revising the escape plan. *Williams II*, 7 Cal.4th at 600, 29 Cal.Rptr.2d 64, 870 P.2d 1072.

The state supreme court agreed with the referee's finding that the evidence obtained after May 21 was obtained in violation of petitioner's Sixth Amendment rights. However, the court adopted the referee's first finding that Oglesby was not employed as an agent of the state prior to May 21, 1979, and described the evidence derived after that date as "comparatively less significant and predominately cumulative" so that its admission and use in closing arguments was harmless error. *Williams II*, 7 Cal.4th at 601–02, 29 Cal. Rptr.2d 64, 870 P.2d 1072. The state supreme court then denied petitioner's third state habeas petition.

This claim hinges on the applicability of the presumption of correctness. Petitioner does not argue the merits of the claim, he only challenges respondent's arguments regarding the applicability of the presumption of correctness. If the presumption applies, the Court will accept the state court's findings of fact regarding Oglesby, and whether and when he became a government agent. The Court can then determine if the admission of Oglesby's testimony was prejudicial. However, if the presumption does not apply, petitioner may be entitled to a further evidentiary hearing on this issue. In Claim H, petitioner sets forth his argument as to why the presumption of correctness does not apply. Therefore, the resolution of Claim G depends almost entirely on the resolution of Claim H.

### Claim H: Full and Fair Adjudication in State Court

Petitioner argues that the presumption of correctness does not apply to Claim G because he did not receive a full and fair adjudication with respect to both of his state evidentiary hearings for several reasons. (Pet. at 41–42.) First, the prosecution failed to disclose materially exculpatory evidence and/or proffered false testimony concerning Oglesby's role as an informant at the 1985 hearing. Second, it was improper for the state supreme court to retrospectively apply a United States Supreme Court case. Third, the prosecution intentionally interfered with petitioner's right to present witnesses at the 1992 hearing.

Pursuant to 28 U.S.C. § 2254(d), a state court's written findings of fact made after a hearing on the merits of a factual issue are presumed to be correct on federal habeas review unless petitioner establishes one of eight exceptions. The eight exceptions are: (1) that the merits of the factual dispute were not resolved in the hearing; (2) that the factfinding procedure employed by the state court was inadequate; (3) that the material facts were not adequately developed at the hearing; (4) that the state court lacked jurisdiction of the subject matter or over the petitioner; (5) that the applicant was indigent and the state court failed to appoint counsel to represent him in the proceeding; (6) that the petitioner did not receive a full, fair and adequate hearing in the State court proceeding; (7) that the applicant was otherwise denied due process of law in the State court proceeding; or (8) unless the record of the State court proceeding, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced and the federal court on a consideration of the record as a whole concludes that such factual determination is not fairly supported by the record. Petitioner's main contention is that the presumption does not apply based on § 2254(d)(6).

■ The presumption applies to findings of historical fact, not conclusions of law or mixed questions of law and fact. *See Iaea v. Sunn*, 800 F.2d 861, 864 (9th

Cir.1986). While deferring to the state court findings of fact, the district court is entitled to give different legal weight to the findings. *Evans v. Lewis*, 855 F.2d 631, 633 (9th Cir.1988). Even if the presumption applies, the petitioner must be given an opportunity "to establish by convincing evidence that the factual determination by the state court was erroneous." 28 U.S.C. § 2254(d). An appellate court can make a finding of fact. *Sumner v. Mata*, 449 U.S. 539, 546, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

### 1. Any Prosecutorial Misconduct Relating to the 1985 Evidentiary Hearing was Mooted by the 1992 Hearing

Petitioner argues that he did not get a full and fair hearing on his jailhouse informant claim in state court because the State withheld exculpatory and material impeachment evidence at the first evidentiary hearing. Respondent argues that the second evidentiary hearing, during which petitioner was able to present all available evidence in support of his claim, mooted any prior failure to disclose evidence. As discussed below, the 1992 hearing was full and fair, therefore, any failure to disclose evidence before the 1985 hearing was mooted.

### 2. Retroactive Application of United States Supreme Court Authority

Petitioner argues that his constitutional rights were violated by the retroactive application of subsequent caselaw to defeat his challenge without affording him an opportunity to meet the alleged new elements. Respondent argues that the state court's application of then-newly-decided authority was not improper or unconstitutional.

 There is no constitutional prohibition preventing a court, on collateral review, from applying a newly decided case to deny a petitioner's habeas claim. *See Lockhart v. Fretwell*, 506 U.S. 364, 373, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Therefore, the state court's retroactive ap-

plication of *Kuhlmann* did not deprive petitioner of a full and fair hearing.

### 3. State's Interference with Petitioner's Right to Present Evidence at the 1992 Evidentiary Hearing

Petitioner argues that he did not receive a full and fair hearing in state court because the State's actions deprived him of crucial relevant testimony at the 1992 evidentiary hearing. He claims his witnesses did not testify because they feared reprisal from the State. Petitioner also claims the state referee or the prosecution should have given his witnesses use immunity.

### a. Petitioner has Failed to Establish that Misconduct on the Part of the State Caused his Witnesses Not to Testify

Petitioner argues that the 1992 evidentiary hearing was not full and fair because the State interfered with his right to compulsory process for obtaining witnesses. Respondent argues that, although the question of whether petitioner received a full and fair hearing is a mixed question of fact and law, the state court findings regarding the underlying facts should be entitled to a presumption of correctness.

 "[S]ubstantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process." *United States v. Little*, 753 F.2d 1420, 1438 (9th Cir.1984). This proposition is well established. *See, e.g., Webb v. Texas*, 409 U.S. 95, 97–98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (defense witness intimidated into not testifying by remarks of trial judge); *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (right to present witnesses to establish defense is fundamental to due process); *United States v. Henricksen*, 564 F.2d 197, 198 (5th Cir.1977) (defense witness intimidated by terms of codefendant's plea bargain); *United States v. Morrison*, 535 F.2d 223, 226–28 (3rd Cir.1976) (defense witness intimidated by prosecutor's remarks); *United States v. Thomas*, 488

F.2d 334, 335–36 (6th Cir.1973) (defense witness intimidated by remarks of secret service agent during court recess). To succeed on his compulsory process claim, petitioner must demonstrate some sort of government misconduct and the misconduct must be the substantial cause for the witness refusing to testify. *See United States v. Hoffman,* 832 F.2d 1299, 1303 (1st Cir.1987); *Berg v. Morris,* 483 F.Supp. 179, 184 (E.D.Cal.1980). Petitioner must also show that the witnesses' testimony would have "been both material and favorable to his defense." *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (footnote omitted).

Petitioner does not argue in his opposition that the 1992 evidentiary hearing was not full and fair because the state actively interfered with his right to introduce witnesses. He relies solely on the argument that the trial court and the prosecution did not grant use immunity to his witnesses. Therefore, the Court will address this portion of the claim solely on those grounds.

b. *Prosecutorial Use Immunity*

■ A criminal defendant is not entitled to compel the government to grant immunity to a witness. *United States v. Westerdahl,* 945 F.2d 1083, 1087 (9th Cir. 1991). However, there is an exception. In *United States v. Lord,* 711 F.2d 887, 890 (9th Cir.1983), the Ninth Circuit noted that "under certain circumstances, such as where the refusal to testify is occasioned by prosecutorial misconduct, use immunity for defense witnesses is necessary to protect and enforce a defendant's due process right to a fair trial." To establish a due process violation, petitioner must show (1) that the witnesses' testimony was relevant, and (2) that the "prosecutor, in refusing to consent to extending immunity to the defense witness, acted with a deliberate intention of distorting the fact-finding process." *Lord,* 711 F.2d at 891.

■ Petitioner has failed to establish any hint of prosecutorial misconduct in this case, nor has he alleged any facts to support the conclusion that the prosecution, in refusing to grant immunity, acted with the deliberate intent to distort the fact-finding process. The state court made various findings of fact regarding each of the witnesses petitioner planned to call and those findings show that the witnesses' decisions not to testify were not the result of improper state action or any deliberate intent to distort the fact-finding process. The state court's findings were as follows:

George Oglesby, who had been suffering from a long-running heart condition, died of a heart attack the day before the 1992 evidentiary hearing began. Petitioner suggested that the prosecutor committed misconduct by arranging to transport Oglesby to the hearing in the same bus with petitioner and that Oglesby was literally scared to death by this prospect. However, the state court found that the prosecutor had been "most solicitous" of Oglesby's safety and had obtained a protective order regarding his transportation and housing. *Williams II,* 7 Cal.4th at 604, 29 Cal.Rptr.2d 64, 870 P.2d 1072. Petitioner has failed to establish any misconduct by the prosecution.

As to Leslie White, the state court found that on March 3, 1992—two days before the evidentiary hearing began—the Attorney General indicted and arrested White for perjury in past cases. One week later, after petitioner called White as a witness, White invoked his Fifth Amendment privilege and declined to testify. Petitioner asserted that the timing of the government's indictment and arrest constituted misconduct. However, petitioner has failed to establish that the State's actions in arresting White for perjury in other cases was "calculated to transform [him] from a willing witness to one who would refuse to testify." *Williams II,* 7 Cal.4th at 608, 29 Cal.Rptr.2d 64, 870 P.2d 1072. Beyond a tenuous inference regarding the timing of White's indictment, petitioner has failed to allege any facts showing that the State indicted White with the deliber-

ate intent of distorting the fact-finding process in petitioner's evidentiary hearing.

Sidney Storch was indicted for perjury in 1991. Petitioner asserted in state court that the State indicted Storch to intimidate him and prevent him from testifying. The state court found that the prosecution was not apprised that Storch was a possible witness until eight months after his indictment, when his name appeared buried among one hundred and one other names in a list of petitioner's possible witnesses. Accordingly, "it is difficult to discern in what way the prosecutor might have committed misconduct." *Williams II*, 7 Cal.4th at 606, 29 Cal.Rptr.2d 64, 870 P.2d 1072 (citation omitted).

Petitioner subpoenaed Ferril Mickens, Larry Montez, and Steven Cisneros to testify on his behalf at the evidentiary hearing. Each witness was serving a substantial prison term when subpoenaed. When called to the stand, each invoked his Fifth Amendment right not to testify. Petitioner alleges that the witnesses were intimidated into invoking their Fifth Amendment privileges because of the State's indictment of White and Storch. The state court found that petitioner had failed to show any misconduct on the part of the government.

The state court found that, concerning Mickens, petitioner failed to secure a protective order regarding Mickens's transportation and housing, and that it appeared based on Mickens's statements at the hearing and his declaration that, "Mickens's fear of his and his family's safety—a fear of petitioner and his counsel, not the People—was the primary cause of his refusal to testify." The state then found that:

> "[a]lthough we may assume that Mickens also considered the prospect that his testimony might, if false, result in an indictment for perjury, that prospect cannot, as a matter of law, support a claim of improper interference with petitioner's Sixth Amendment right of compulsory process. Nor are we willing to

assume that Mickens could reasonably have believed that his truthful testimony would result in a perjury prosecution. Accordingly, we conclude that whatever the effect of the indictments for perjury of White and Storch, that effect was insubstantial insofar as it concerned Mickens's refusal to testify."

*Williams II*, 7 Cal.4th at 608, 29 Cal. Rptr.2d 64, 870 P.2d 1072.

As to Montez, petitioner failed to secure a protective order for his transportation to and housing during the evidentiary hearing. Like Mickens, Montez stated at the evidentiary hearing that he wished to invoke his Fifth Amendment rights for two reasons: he believed his answers would incriminate him and he felt intimidated by petitioner. The state court concluded that, for the same reasons set forth in their discussion of Mickens, the effect of the indictments of White and Storch were insubstantial insofar as it concerned Montez's refusal to testify. *Williams II*, 7 Cal.4th at 608, 29 Cal.Rptr.2d 64, 870 P.2d 1072.

As to Cisneros, the state court found that petitioner failed to prove misconduct which was designed to intimidate Cisneros into invoking his Fifth Amendment rights. As with Mickens and Montez, petitioner did not secure a protective order for Cisneros's transportation to and housing during the evidentiary hearing. The inquiry as to Cisneros is a little more difficult because, in a declaration signed two weeks before the evidentiary hearing, he stated that "as a result of the indictment and arrest of Sidney Storch and Leslie White, I am now unwilling to testify at petitioner's evidentiary hearing for fear that I will be indicted if I provide testimony helpful to Petitioner. I am further fearful for my safety should I be transported to and housed in the Los Angeles County jail system." *Williams II*, 4 Cal.4th at 609, 15 Cal.Rptr.2d 400, 842 P.2d 1160. However, the mere fact that Cisneros thought that his testimony might

result in an indictment for perjury if he incriminated himself is not sufficient to show a denial of due process for the failure to grant use immunity. In addition, petitioner has failed to show any misconduct or a deliberate intent to distort the fact-finding process on the part of the State.

Petitioner has failed to allege any facts establishing that the State indicted White and Storch to force them and petitioner's other witnesses to take the Fifth Amendment or that the State acted with the deliberate intent to distort the fact-finding process. The Court will defer to the state court findings of fact regarding petitioner's witnesses and adopt the state court's ruling that petitioner failed to establish any prosecutorial misconduct regarding their invocation of the Fifth Amendment. Therefore, petitioner was not denied a full and fair evidentiary hearing by the prosecution's failure to provide use immunity for petitioner's witnesses.

c. *Judicial Use Immunity*

■ Petitioner also alleges that his constitutional rights were violated when the state court referee denied his motion to provide his witnesses with use immunity.

The Third Circuit, in *Gov't of Virgin Islands v. Smith,* 615 F.2d 964, 969 (3rd Cir.1980), held that a court "has the inherent authority to effectuate the defendant's compulsory process right by conferring a judicially fashioned immunity upon a defense witness whose testimony is essential to an effective defense." The Ninth Circuit recognized the notion of judicial immunity espoused in Smith, but declined to address it directly. *Lord,* 711 F.2d at 891 n. 2. However, the circuit's holdings in other cases "reveal that it does not view the judiciary as possessing inherent authority to grant immunity." *United States v. Westerdahl,* 727 F.Supp. 1364, 1368 (D.Or.1989) (citing *United States v. Mendia,* 731 F.2d 1412, 1414 (9th Cir.1984) ("a district court has neither the power to grant use immunity to individuals whom the defendant seeks to call as witnesses,

nor the power to force the government to grant such immunity."); *United States v. Alessio,* 528 F.2d 1079, 1082 (9th Cir.1976) ("[t]o interpret the Fifth and Sixth Amendments as conferring on the defendant the power to demand immunity for co-defendants, potential co-defendants or others whom the government might in its discretion wish to prosecute would unacceptably alter the historic role of the Executive Branch in criminal prosecutions.")).

In this circuit and according to the state supreme court, the state evidentiary hearing referee did not have the authority to grant petitioner's motion for use immunity for his witnesses, therefore, the referee's failure to grant petitioner's motion did not deprive him of a full and fair hearing.

4. *Conclusion*

Petitioner has failed to establish that he was denied a full and fair hearing at either the 1985 or 1992 evidentiary hearings and the Court will presume that any factual findings made by the state court after those hearings are correct. The Court must now decide whether the introduction of the evidence related to Oglesby by petitioner after May 21–22, 1979, had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710. Harmless error is a mixed question of law and fact; the background facts are still entitled to a presumption of correctness, but the Court reviews de novo the state court's conclusion that the introduction of the improperly obtained evidence was harmless. *Dickson v. Sullivan,* 849 F.2d 403, 405 (9th Cir.1988).

a. *Pre–May 21, 1979 Evidence*

Oglesby obtained the following information in his conversations with petitioner prior to May 21, 1979:

Soon after petitioner met Oglesby the two men began talking about guns and petitioner asked Oglesby if the police would be able to link shotgun shells to a specific weapon. Later, petitioner told

Oglesby that he, Blackie, and two others had held up a motel and that petitioner had shot a man, woman, and their daughter in the motel.

Petitioner asked Oglesby about the chances of escaping from the jail. Oglesby told him that they were "very poor." Later, petitioner told Oglesby that the weak link in the custody system was the transfer from jail to court and back. Petitioner drew a detailed map of the court layout and diagramed his escape plan. Petitioner thought that the bus could be stopped by having someone pull a car in front of it. Someone from the outside could then disarm the deputy inside the bus and free petitioner and Oglesby. Petitioner then said that he would kill a person on the bus who was going to testify against him, drive the bus to a nearby location, kill the two deputies on the bus, and escape in a waiting vehicle. Petitioner later sent Oglesby two notes, one of which stated that petitioner's friends had obtained a new shotgun. *Williams II*, 7 Cal.4th at 599–600, 29 Cal.Rptr.2d 64, 870 P.2d 1072.

### b. *Post–May 21, 1979 Evidence*

The evidence obtained from petitioner after May 21, 1979 is generally cumulative of the information discussed above. Petitioner changed the escape plan to blow up the bus to dismember everyone inside and make it difficult for the authorities to determine who escaped. Petitioner also sent Oglesby five additional notes in which he refined and revised the escape plan. In one note, petitioner asked whether they should try to engineer a trip to the county hospital to hasten the escape attempt. In another note, petitioner noted that his brother had been sentenced to three months in county jail and asked whether to delay the escape attempt in order to obtain his brother's assistance. In another note, petitioner claimed to have dynamite for the escape, and, in still another, petitioner wrote that Blackie was "a heartbeat away from death waiting for an interruption. I'm it." *Williams II*, 7 Cal.4th 601 n. 13, 870 P.2d 1072, 29 Cal.Rptr.2d 64.

### c. *Harmless Error*

Even assuming the post–May 21, 1979, evidence had not been introduced, there is no reasonable probability that the result would have been different. As to the guilt phase, the majority of Oglesby's testimony went to the escape plan as evidence of consciousness of guilt. However, it was the plan to escape itself, not the specific details of the final plan, that was relevant to the guilt phase. Moreover, petitioner's guilt depended on the testimony of Coward, Colemen, the Garretts, and the prosecution's firearms expert. Petitioner's admission to the killing and the fact that he was trying to escape were additional evidence of his guilt. However, the escape evidence was not essential to the prosecution's guilt case and the other evidence of petitioner's guilt was strong, therefore, the admission of the post–May 21, 1979, evidence was harmless.

As to the penalty phase, the escape plan, in that it involved the killing of at least two guards and several other inmates, was aggravating. However, this evidence was properly admitted as it was obtained from petitioner before May 21, 1979. That petitioner later threatened to kill Blackie Coward and blow up the bus made the escape plan more violent and consequently the evidence was more aggravating. However, the jury could have inferred from petitioner's first plan that he intended to kill Coward and the original plan involved the murder of at least two guards. The escape evidence played a minor role in the prosecutor's closing argument, no mitigating evidence was presented at trial, and the jury had already convicted petitioner of the cold-blooded murders of four people to eliminate them as witnesses to a robbery. They had also heard evidence that petitioner laughed while describing the murder of one of his victims. In light of all of the evidence presented at trial, it is unlikely that the admission of the post–May 21, 1979, evidence had "a substantial and injurious effect or influence in deter-

mining the jury's verdict." *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710.

Based on the foregoing, the motion for summary judgment is GRANTED as to Claims G and H.

### Claim I: Failure to Disclose Exculpatory Evidence at Trial.

Petitioner claims the prosecution failed to disclose various evidence relating to Oglesby's credibility at trial. Respondent argues that he is entitled to summary judgment based on the factual findings made by the state supreme court and because any undisclosed evidence was not material.

The prosecution has a duty to turn over all exculpatory evidence to the defense. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates Due Process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." *Giglio,* 405 U.S. at 154, 92 S.Ct. 763. However, disclosure is only required when the evidence is material. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. Petitioner may establish a Brady violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555. The main consideration is whether petitioner, as a result of the failure to disclose the undisclosed evidence, was deprived of a fair trial. *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

### 1. *Evidence Withheld by the Prosecution*

Petitioner argues that the prosecution failed to disclose a 1978 tape recording of a conversation between Oglesby and Leslie White. (Opp.Ex. 77.) Lt. Fitzgerald made the secret recording which allegedly shows that Oglesby and White conspired to fabricate testimony in an unrelated murder case, and that Fitzgerald, well before petitioner's case arose in 1979, used Oglesby to secure information.

Another tape recording of a 1979 interview between White and investigators for the Los Angeles District Attorney's Office contains charges by White that Oglesby had been forced to testify to bolster a weak prosecution case in another matter; that Fitzgerald attempted to assist White in fabricating an admission from a defendant named Bracero; and that Oglesby told White that Fitzgerald and Allender "made him lie, told him, made him say what to say . . . ." Like the 1978 recording, this recording was not disclosed at trial or during the first evidentiary hearing.

Petitioner argues that the State also failed to disclose a November 4, 1988, internal memorandum by a deputy district attorney explaining his decision not to use Oglesby in another case because he distrusted him and thought Oglesby taught White the "business of being a jailhouse informant."

Finally, petitioner argues that the State knowingly put on false testimony based on a declaration by White that Oglesby told him several times that "he had 'put a story together' regarding confessions and admissions allegedly made by 'Tookie' Williams;" that Oglesby told White that he put the story together by obtaining pertinent information from law enforcement via telephone to assist in the fabrication of statements; that Oglesby told White "that [he] had gotten 'the stupid nigger' to draw a map to incriminate him in connection with an escape plan which Mr. Oglesby was manufacturing in an attempt to reduce Mr. Oglesby's own first degree murder

charge;" that Oglesby told White that Detective Allender had told him to "go in there and get information regarding Williams;" and that Oglesby told White that Fitzgerald had revealed details of the investigation to him. (Pet. at 47–48; Opp. Ex. 56.)

### 2. *State Court Findings of Fact*

The parties agree that this is a mixed question of law and fact. (Mot. at 221; Opp. at 178). Petitioner argues that the Court should not defer to the state court findings of fact on this issue because he did not receive a full and fair state evidentiary hearing. However, as discussed in relation to Claim H above, petitioner obtained a full and fair hearing. Thus, the Court will adopt the state court findings regarding the underlying facts. However, the state court made findings of fact as to only one of the allegations of withholding evidence. As to the others, the state court held that, "assuming there was a Brady violation, it was harmless." *Williams II*, 7 Cal.4th at 611, 29 Cal.Rptr.2d 64, 870 P.2d 1072.

The state court found that, as to the 1988 memorandum, the evidence in question did not even exist at the time of petitioner's trial. Obviously, there was no failure to disclose the existence of that document at trial. *Williams II*, 7 Cal.4th at 611, 29 Cal.Rptr.2d 64, 870 P.2d 1072.

As to the allegation concerning the 1978 tape recording of a conversation between Oglesby and White by Fitzgerald, the state court referee found the nature of the conversation to be completely different from that represented by petitioner.[8] It appears that Oglesby contacted Fitzgerald and told him of a purported scheme by White to implicate Oglesby in a crime in Ventura so that White, who was in custody in Los Angeles, could be transferred to Ventura to testify against Oglesby and attempt to escape from the Ventura jail. The phone call was initiated by White to

Oglesby with Fitzgerald listening and taping the conversation. *Williams II*, 7 Cal.4th at 589, 29 Cal.Rptr.2d 64, 870 P.2d 1072.

As for White's statements in his 1989 declaration, the state court found—in addressing petitioner's claim that he was denied the right to compulsory process—that petitioner failed to introduce any evidence to corroborate those statements and that the assertions by White that Oglesby testified falsely at petitioner's trial (and by extension that the prosecutor had knowingly proffered false testimony) had been rebutted by unobjected-to evidence of White's recantation of that 1989 declaration. *Williams II*, 7 Cal.4th at 605, 29 Cal.Rptr.2d 64, 870 P.2d 1072.

Although the state court did make one finding of fact regarding this claim, it ultimately denied the claim on the grounds that, had the information been disclosed to the defense, the result of the proceedings would not have been different. *Id.* at 611–613, 29 Cal.Rptr.2d 64, 870 P.2d 1072. Therefore, the presumption of correctness alone is not sufficient to grant summary judgment as to this claim.

### 3. *Materiality of the Undisclosed Evidence*

▮ The evidence identified by petitioner, had it been disclosed to the defense, was not material. Defense counsel did a good job of attacking Oglesby's credibility. During his testimony, Oglesby admitted that he had pled guilty to second degree murder (10 RT 2391); he stated that he had also been charged with two counts of kidnaping and one count of rape (10 RT 2432), but that those charges had been dropped; that he was facing a possible sentence of life without possibility of parole, but that he expected to only serve eight years after a plea bargain (10 RT 2449); that he had previously provided information to the prosecution in four or

---

8. The state supreme court did not adopt these findings, therefore, it is not clear that this could be considered a state court "finding" which would be entitled to a presumption of correctness. *Williams II*, 7 Cal.4th at 611, 29 Cal.Rptr.2d 64, 870 P.2d 1072.

five other cases (10 RT 2442); that he became known as a "snitch" in jail (10 RT 2443); and that he provided testimony in petitioner's case hoping to obtain some benefit with respect to the charges pending against him (10 RT 2450). Defense counsel showed Oglesby to be an admitted murderer (and accused rapist) who had, as a result of his testimony against petitioner, received a drastic reduction in his sentence for murder. Defense counsel got Oglesby to admit that he had a social relationship with Fitzgerald and that he was a snitch who had previously provided information to the prosecution. His background, character, and strong motive to provide inculpatory evidence were all disclosed to the jury. The additional evidence regarding Oglesby's conversations with White would not have cast him in a significantly worse light. There is no credible evidence that Oglesby was induced to concoct the evidence of the escape plot. In addition, the undisclosed evidence related to Oglesby's credibility, not to petitioner's guilt or innocence, and the evidence was essentially cumulative of the other evidence showing that Oglesby was an experienced jailhouse informant with a motive to lie to benefit himself. Based on all the circumstances, petitioner has failed to establish that; had the impeachment evidence been disclosed to the defense at trial, there is a reasonable probability that the result of the proceeding would have been different. Therefore, the Court GRANTS the motion for summary judgment as to this claim.

## Claim J: Trial Counsel's Failure to Object to Oglesby's Testimony

■ Petitioner contends that his constitutional rights were violated when his trial attorney failed to object to or move to suppress Oglesby's testimony under the Sixth Amendment. He argues that trial counsel did no legal research on the Sixth and Fourteenth Amendment issues and was unfamiliar with *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

The Court has already found that the introduction of the post–May 21, 1979, evidence was harmless. Therefore, even assuming petitioner could establish that trial counsel provided deficient performance for failing to object to the admission of that evidence on federal constitutional grounds, the failure to object was not prejudicial. There is no reasonable probability that, had the post-May 21, 1979, evidence not been introduced, the result of the proceeding would have been different, therefore, the Court GRANTS the motion for summary judgment as to this claim.

## Claim K: Admission of Oglesby's Testimony Violated the Fifth Amendment

■ Petitioner claims the admission of Oglesby's testimony violated the Fifth Amendment because he did not receive *Miranda* warnings before Oglesby elicited incriminating statements from him. (Pet. at 50.)

This claim is foreclosed by United States Supreme Court authority. In *Illinois v. Perkins*, 496 U.S. 292, 294, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), the Court held that "*Miranda* warnings are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." The Court found that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." *Id.* at 296, 110 S.Ct. 2394.

Petitioner argues that *Perkins* is distinguishable because Perkins, unlike petitioner, had not previously invoked his Fifth Amendment right to counsel. Had he done so, "the inquiry would focus on whether he subsequently waived the particular right." *Perkins*, 496 U.S. at 300, 110 S.Ct. 2394 n. * (Brennan, J., concurring). Although Perkins, who was in jail on an unrelated robbery charge when the undercover agent elicited incriminating

statements from him on a murder charge, had not invoked his Miranda rights with respect to the new charges, the majority's opinion made it clear that *Miranda* is not implicated outside of a police-dominated atmosphere. *Id.* at 296, 110 S.Ct. 2394. This police-dominated atmosphere was not present in petitioner's conversations with Oglesby. The cases cited by Justice Brennan in the footnote referenced by petitioner discuss whether a defendant can be reinterviewed by police after he has invoked his Miranda rights, not the issue raised by petitioner in this claim. *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (holding defendant's confession inadmissible where he exercised his right to an attorney on January 19 and questioning ceased, then was re-questioned by police on January 20 and confessed); *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (defendant's confession to murder held admissible when he was questioned by police two hours after he had exercised his right to remain silent as to an unrelated robbery interrogation). Petitioner has failed to cite any case for the proposition that a defendant's Miranda rights might be violated when he is questioned by a jailhouse informant posing as a sympathetic ear.

Regardless of whether petitioner had invoked his Fifth Amendment rights, those rights were not violated by Oglesby's failure to give petitioner the Miranda warnings before speaking to him. "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The concern that petitioner would have felt compelled to confess in a "police dominated atmosphere" was not implicated in this case. Therefore, the Court GRANTS summary judgment as to this claim.

## Claim L: Trial Counsel's Failure to Object to Oglesby's Testimony on Fifth Amendment Grounds

As discussed in relation to Claim K above, the admission of Oglesby's testimony did not violate petitioner's Fifth Amendment rights, therefore, trial counsel was not ineffective in failing to object to Oglesby's testimony on that ground. The Court GRANTS summary judgment as to this claim.

## Claim M: Trial Court's Failure to Give a Cautionary Instruction on Informant Testimony *Sua Sponte*

Petitioner alleges that his constitutional rights were violated when the trial court failed to instruct the jury that the testimony of informants should be viewed with suspicion and distrust, and is inherently unreliable. (Pet. at 51.)

The failure of a trial court to give an instruction *sua sponte* about the unreliability of informant or accomplice testimony does not necessarily constitute plain error requiring a reversal. *Bonin v. Vasquez,* 807 F.Supp. 589, 617 (C.D.Cal.1992), *aff'd,* 59 F.3d 815 (9th Cir.1995). "The need for the instruction must be analyzed in light of the circumstances in the case." *Id.* For example, if the informant's testimony is uncorroborated and is also critical and suspect, the failure to give an informant instruction might constitute error. *United States v. Bosch,* 914 F.2d 1239, 1247 (9th Cir.1990) (citing *United States v. Martin,* 489 F.2d 674, 677 n. 3 (9th Cir. 1973)). However, other credibility instructions and credibility arguments by counsel might make the informant instruction unnecessary. *Bonin,* 807 F.Supp. at 617.

In this case, the jury was given detailed instructions regarding the credibility of witnesses and accomplices, including instructions regarding inconsistent statements by a witness (CT 453); how to assess the credibility of a witness (CT 454–55); witness who is willfully false (CT 456); witness who has been convicted of a felony (CT 458); witness's character for honesty

or veracity (CT 459); the sufficiency of the testimony of only one witness (CT 460); that the testimony of an accomplice must be corroborated (CT 475); the sufficiency of evidence required to corroborate an accomplice (CT 476); that one accomplice may not corroborate another (CT 477); and that the testimony of an accomplice should be viewed with distrust (CT 480).

The credibility of the various witnesses was discussed by both counsel during their closing arguments at the guilt phase. Petitioner's counsel noted that James Garrett "abhors welfare, but can mastermind gun store robberies, sale of hot merchandise, falsify drivers license, fake accidents, extort lawyers and had access to the shotgun at all times." (12 RT 2979.) He noted that Esther Garrett testified that she had previously lied under penalty of perjury in obtaining welfare benefits. (12 RT 2980.) He questioned why petitioner, "the big strong black man [would] confide in Mr. Oglesby, the known jailhouse rat?" (12 RT 2980.) In addition, defense counsel questioned each witness at length about their prior felony convictions, their motives for providing favorable testimony for the prosecution, their characters for truthfulness and veracity, and deals they received for testifying.

Respondent also argues that, assuming the Garretts should be considered informants, the testimony of Oglesby and the Garretts was not critical to the People's case. The prosecution presented other evidence of petitioner's guilt, including the testimony of a criminalist regarding petitioner's shotgun and the shotgun shells, the testimony of Samuel Coleman, and the corroborated testimony of petitioner's accomplice. Petitioner argues that the testimony of three or four unreliable witnesses does not make their testimony more reliable, and that, because of the sparse direct evidence of his involvement in the murders, the testimony regarding his incriminating statements was critical to the prosecution.

The motion for summary judgment is GRANTED on this claim. Based on the extensive instructions regarding the credibility of witnesses in general and accomplices in particular given by the trial court, the thorough job done by defense counsel of attacking the witnesses' credibility, and the fact that the testimony of the Garretts and Oglesby, while important, was not critical to the prosecution, the trial court's failure to sua sponte give an informant instruction did not violate petitioner's constitutional rights.

**Claim N: Improper Admission of Escape Evidence/Improper Flight Instruction**

Petitioner claims the trial court erred in admitting evidence of his escape plan at both the guilt and penalty phases, and erred by instructing the jury that the escape plan could be used as evidence of consciousness of guilt. (Pet. at 52.)

As discussed above, Oglesby testified about conversations he had with petitioner regarding potential escape plans. The prosecutor also introduced notes and a map from petitioner detailing various aspects of the escape plan. Trial counsel objected to the introduction of this evidence on the ground that, under Cal.Evid. Code § 352, it was more prejudicial than probative but the objection was overruled.

Petitioner raises an issue of the application of state evidentiary law. A federal writ of habeas corpus is only proper where a prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241. A federal court cannot consider a claim of violation or erroneous application of state law. *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). However, a federal court may grant habeas relief on a state law claim in those rare instances where the violation of state law amounts to a due process violation. *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Thus, the Court must determine "whether the ad-

mission of the evidence so fatally infected the proceedings as to render them fundamentally unfair." *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir.1991).

▮ Respondent based his request for summary judgment on the proposition that "if [the escape] evidence were properly admitted under state law ... then no federal constitutional violations occurred." (Mot. at 245.) He then notes that the California Supreme Court, the final arbiter of state law, held that the evidence of petitioner's planned escape was admissible under state law. *Williams I*, 44 Cal.3d at 1143–44, 245 Cal.Rptr. 635, 751 P.2d 901. Therefore, respondent asserts that he is entitled to judgment as a matter of law. However, the fact that the evidence is admissible under state law is not necessarily determinative as "state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness." *Jammal*, 926 F.2d at 919. The issue is not whether the admission of the evidence was proper or improper under state law, but rather whether its admission "rendered the trial so arbitrarily and fundamentally unfair that it violated federal due process." *Reiger v. Christensen*, 789 F.2d 1425, 1430 (9th Cir.1986).

### 1. *Admission of the Escape Evidence at Guilt Phase*

▮ The jury was instructed that it could use the escape plans as evidence of consciousness of guilt. The fact that petitioner was making plans to escape from jail was additional evidence of his guilt. However, petitioner's guilt depended on the testimony of Coward, Colemen, the Garretts, and the prosecution's firearms expert. The escape evidence was not essential to the prosecution's guilt case and the other evidence of petitioner's guilt was strong. In addition, the escape evidence was not overly inflammatory or prejudicial. Therefore, the Court finds that the admission of the escape evidence at the guilt phase did not render petitioner's trial fundamentally unfair.

### 2. *Admission of the Escape Evidence at the Penalty Phase*

▮ In the second portion of this claim, petitioner argues that the escape evidence was improperly admitted in the penalty phase under Cal.Pen.Code § 190.3(b) which allows the jury to consider "the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Respondent argues that the state court found that the prosecutor actually discussed this evidence in relation to § 190.3(a), which allows the jury to consider as an aggravating factor the circumstances of the crime for which petitioner was convicted at the guilt phase, and as evidence disproving the existence of evidence under § 190.3(d), which allows the jury to consider as a mitigating factor the presence of extreme mental or emotional distress. The court then stated that, if the evidence was improperly admitted under § 190.3(a), any error was harmless. *Williams I*, 44 Cal.3d at 1147, 245 Cal.Rptr. 635, 751 P.2d 901.

As to the penalty phase, the escape plan, in that it involved the killing of at least two guards and one other inmate, was aggravating. However, the evidence that petitioner murdered four people to eliminate witnesses to his robberies then laughed about the death of one of the victims constituted the bulk of the aggravating evidence especially in light of petitioner's failure to present any mitigating evidence. The escape evidence played a minor role in the prosecutor's closing argument, and was not inflammatory. In light of all of the evidence presented at trial, the Court cannot say that the admission of the escape evidence at the guilt phase so infected the penalty trial that petitioner's due process rights were violated.

### 3. *Flight Instruction*

Petitioner's final argument is that the flight instruction given by the trial court

was vague because it allowed the jury to consider the escape evidence as a crime of "attempted escape" without defining the elements for an attempted escape. Respondent argues that the term "attempted escape" was used to describe petitioner's conduct, not to have the jury find him guilty of the crime of attempted escape.

■ A faulty jury instruction compels the issuance of a writ only where the instruction so infects the entire trial that the resulting conviction violates due process. *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Whether the instruction violates due process depends "upon the evidence in the case and the overall instructions given to the jury." *Duckett*, 67 F.3d at 745.

The challenged instruction in this case, given at the end of the guilt phase, stated:

The attempted escape of a person after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but it is a fact which, if proved, may be considered by you in light of all other proved facts in deciding the question of guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine.

(CT 462.)

■ Petitioner seems to be arguing that the flight instruction allowed the jury to consider the evidence of the attempted escape under § 190.3(b), but that the instruction was inadequate because it did not instruct the jury on the elements they had to find to use the attempted escape as an aggravating factor under that subsection. However, petitioner's argument does not make sense because the prosecution was not trying to establish that petitioner was guilty of the crime of "attempted escape" at the penalty phase. The prosecution introduced the escape evidence at the guilt phase to show consciousness of guilt. The escape evidence could then have been considered by the jury in the penalty phase under § 190.3(a)—the circumstances of the crime. Although the prosecutor improperly argued that the circumstances of the crime could also be considered as aggravating evidence under § 190.3(b), he did not specifically argue that the escape plan should be considered as a prior crime of attempted escape.

The trial court allowed the prosecution to introduce the attempted escape evidence at trial to show consciousness of guilt. The trial court then gave a modified flight instruction to the jury so they would understand what to do with the escape evidence at the guilt phase. The prosecution did not allege that petitioner was guilty of the crime of attempted escape either at the guilt or penalty phase, therefore, the trial court was not required to instruct the jury on the elements of "attempt" or "escape." The flight instruction was proper at the guilt phase and the instruction, which was not repeated at the penalty phase, did not so infect the penalty trial as to amount to a violation of petitioner's due process rights.

Based on the foregoing, the Court GRANTS summary judgment on this claim.

### Claim O: *Carlos* Error

Petitioner argues that his constitutional rights were violated because the state supreme court retroactively applied the decision in *People v. Anderson*, 43 Cal.3d 1104, 240 Cal.Rptr. 585, 742 P.2d 1306 (1987). *Anderson* overruled *Carlos v. Superior Court*, 35 Cal.3d 131, 197 Cal.Rptr. 79, 672 P.2d 862 (1983), which held that intent to kill was an element of the felony murder special circumstance.

■ The retroactive application of *Anderson* does not constitute a violation of petitioner's federal constitutional rights where the conviction occurred before *Carlos* was decided. *Hamilton v. Vasquez*, 17 F.3d 1149, 1164 (9th Cir.), *cert. denied*, 512 U.S. 1229, 114 S.Ct. 2728, 129 L.Ed.2d 851 (1994) (rejecting Ex Post Facto claim); *see also Hunt v. Vasquez*, 899 F.2d 878, 881 (9th Cir.1990) (same); *Hughes v. Borg*, 898

F.2d 695, 704–05 (9th Cir.1990) (no due process violation). *Carlos* was issued on December 12, 1983. Petitioner was found guilty on April 23, 1983, and sentenced to death on July 12, 1983.

Petitioner also argues that the refusal to reverse his sentence when the sentences of similarly situated defendants were reversed under *Carlos* violated his right to equal protection. The Equal Protection Clause requires that "once the state has established a rule it must be applied evenhandedly." *Myers v. Ylst*, 897 F.2d 417, 421 (9th Cir.1990). This does not prevent a state from changing its rules as long as the new rule is applied evenhandedly. Petitioner has cited no case since the decision in *Anderson* to which *Carlos* was applied and not *Anderson*, therefore, there is no Equal Protection violation.

Based on the foregoing, the motion for summary judgment is GRANTED on this claim.

### Claim P: Denial of Right to Representative Jury

Petitioner claims the jury which convicted him and sentenced him to death was not drawn from a cross-section of the community because it was drawn only from voter registration lists. Petitioner also argues that the use of the "bullseye" system to select his jury was improper. Finally, petitioner argues that his trial attorney's failure to object to the process by which his jury was selected constitutes ineffective assistance of counsel. (Pet. at 58–59.)

■ Petitioner has a Sixth Amendment right to trial by a jury drawn from a representative cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). However, petitioner is not entitled to a jury of any particular composition or one that mirrors the demographic population or reflects the various distinctive groups in the population. *Id.* at 538, 95 S.Ct. 692. To establish a prima facie violation of the right to a jury drawn from a representative cross-section, petitioner must show

that: (1) the group alleged to be excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) the under-representation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

■ Petitioner's first two claims are without merit. First, under federal law, the use of voter registration lists to select a venire pool of potential jurors is constitutional and is, in fact, the preferred method for selecting jurors. *See, e.g., Bershatsky v. Levin*, 99 F.3d 555, 556 (2d Cir.1996); *Schanbarger v. Macy*, 77 F.3d 1424, 1424 (2d Cir.1996); *United States v. Ashley*, 54 F.3d 311, 314 (7th Cir.1995); *United States v. Brady*, 579 F.2d 1121, 1131–34 (9th Cir. 1978). Second, the "bullseye" system was not used to select potential jurors at the time of petitioner's trial, therefore, he cannot complain about its use. (Mot. at 272.)

Respondent argues that, because his federal claims are without merit, petitioner's "parasitic" claim of ineffective assistance of counsel must also fail. Although petitioner is not entitled to relief on the ineffective assistance of counsel claim, it is not for the reasons expressed by respondent.

■ On October 20, 1980, a superior court judge granted a state prisoner's petition for a writ of habeas corpus on the grounds that the use of voter registration lists violated the United States and California constitutions. On appeal, the superior court's decision was upheld and the California Court of Appeal held that a challenge to the use of voter registration lists may be based on comparisons between minority representation in venires and their representation in the general population. *In re Rhymes*, 130 Cal.App.3d

232, 181 Cal.Rptr. 764 (1982).[9] On May 27, 1982, the California Supreme Court granted hearing in *Rhymes*. In 1984, while *Rhymes* was pending before it, the California Supreme Court decided *People v. Harris*, 36 Cal.3d 36, 201 Cal.Rptr. 782 (1984). In *Harris*, the defendant also challenged the constitutionality of the use of voter registration lists as the basis for the jury venire. The California Supreme Court held that the showing of underrepresentation made was sufficient to state a prima facie case. *Harris*, 36 Cal.3d at 52, 201 Cal.Rptr. 782, 679 P.2d 433. Petitioner argues that any reasonably competent attorney would have known that the jury selection procedure was susceptible to this type of attack, would have moved to quash the procedures used to select his jury venire, and that there was no reasonable tactical reason not to do so. (Opp. at 202.)

*Rhymes* and *Harris* were not issued until after petitioner was sentenced. Trial counsel is not required to correctly anticipate changes in the law. *Carter*, 92 F.3d at 670. Although challenges to jury venires on the basis of the sole use of voter registration lists were made before petitioner's trial, in light of the strong presumption that petitioner's counsel's conduct "fell within the wide range reasonable professional conduct," *Strickland*, 466 U.S. at 668, 104 S.Ct. 2052, the Court cannot say that trial counsel's failure to object was outside that wide range. Indeed, petitioner has alleged no facts to support his conclusion that any reasonable trial attorney in 1981 would have moved to quash petitioner's jury venire based on the decision of one superior court judge made three months before jury selection began in his case. "Only in a rare case can an attorney's performance be considered unreasonable under prevailing professional standards when she does not make an objection which could not be sustained on the basis of the existing law." *Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3rd Cir.1989). Petitioner's is not that case.

Based on the foregoing, the Court GRANTS the motion for summary judgment as to this claim.

## Claim Q and R: Trial Counsel's Failure to Investigate and Present Mitigating Evidence

■ Petitioner's attorney presented no mitigating evidence at the penalty phase of his trial. The federal habeas petition pleads lengthy, detailed allegations enumerating the mitigating evidence that could have been presented at the penalty phase. (Pet. at 61–71.) Petitioner claims trial counsel was ineffective in failing to uncover and present this evidence at the penalty phase. Respondent argues that he is entitled to summary judgment because petitioner instructed his attorney not to present any mitigating evidence. Petitioner argues that his attorney failed to adequately explain the nature and scope of possible mitigating evidence, and failed to investigate potential mitigation evidence, therefore, his alleged waiver is inconsequential.

The failure to present available mitigating evidence at the penalty phase can form the basis of an ineffective assistance of counsel claim. To "fail to present important mitigating evidence in the penalty phase—if there is no risk in doing so—can be as devastating as a failure to present proof of innocence in the guilt phase." *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir.1992). Presenting evidence of a defendant's background and character can be especially helpful because of "the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302,

---

9. The California Supreme Court directed the court of appeal to refile the opinion at 170 Cal.App.3d 1100, 217 Cal.Rptr. 439 (1985).

312, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Petitioner must also establish that the failure to present mitigating evidence caused him prejudice. Prejudice is shown when there is a reasonable probability that, absent the errors, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052.

This claim is not ripe for summary judgment. Petitioner is "entitled to an evidentiary hearing where there has been no state court evidentiary hearing and [he] raises a 'colorable' claim of ineffective assistance." *Siripongs v. Calderon*, 35 F.3d 1308, 1314 (9th Cir.1994). Petitioner has alleged that his attorney failed to conduct a sufficient investigation to allow the attorney to make an informed decision about what mitigation evidence could have been presented, and that, besides the testimony of his parents, there was substantial other evidence available. As the court in *Siripongs* recognized, "without the benefit of an evidentiary hearing we cannot determine if counsel's decision was a strategic one, and if so, whether the decision was a sufficiently informed one." *Id.* Assuming a lawyer in a capital case may refuse to put on mitigating evidence at the request of his client, there remains a question of fact concerning what investigation trial counsel did to uncover potentially mitigating evidence. The record before the Court does not reflect what investigation counsel undertook into potential mitigation evidence, what counsel told petitioner about the scope of possible mitigating evidence, and the substance of counsel's communications with his client. Petitioner's claim depends on the reasons for counsel's decisions. In the absence of evidence in the record regarding counsel's decisions and the reasons for those decisions, the record is insufficient for the Court to grant summary judgment. Therefore, this claim shall be subject to the evidentiary hearing already scheduled in this case and the motion is DENIED.

## Claim S: Improper Consideration of Multiple Murder Special Circumstances

■ The jury found true four multiple murder special circumstance allegations. However, under California law, only one multiple murder circumstance is appropriate regardless if two or ten people are killed by the defendant. *Williams I*, 44 Cal.3d at 1146, 245 Cal.Rptr. 635, 751 P.2d 901. The Court must thus determine whether the additional findings of multiple murder had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638, 113 S.Ct. 1710.

The prosecutor briefly alluded to the multiple murder special circumstances in his closing argument, but did not rely on them in support of his request for the death penalty. He did not argue that the jury should use the four multiple murder special circumstances as four separate aggravating circumstances. (12 RT 2023.)

The Ninth Circuit rejected a similar claim in *Williams v. Calderon*, 52 F.3d 1465 (9th Cir.1995). The circuit held that "it is highly unlikely that the jury simply counted up the special circumstances charged and based the verdict on such calculation." *Id.* at 1480. The *Williams* court also rejected the claim because "state courts in weighing states may still cure the consideration of improper factors in sentencing by weighing or by conducting constitutional harmless error review." *Id.* (citing *Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992)). In this case, the California Supreme Court conducted a harmless error analysis, stating "we find it difficult to believe that the sheer 'number' of aggravating factors that flowed from the same underlying conduct in itself unduly prejudiced the jury." *Williams I*, 44 Cal.3d at 1147, 245 Cal. Rptr. 635, 751 P.2d 901. "This review and conclusion satisfy the requirements for constitutional harmless error analysis." *Williams*, 52 F.3d at 1480. Respondent is entitled to summary judgment on this claim, and the motion is GRANTED.

## Claim T: Mandatory Weighing Instruction

 Petitioner claims that constitutional error occurred when the jury was instructed in the penalty phase that if the aggravating factors outweighed the mitigating factors, they "shall" impose death. He argues that the instruction made the death sentence mandatory when aggravation outweighed mitigation instead of informing the jury that they had the discretion to impose a life sentence regardless of the existence of aggravating evidence. Respondent argues that he is entitled to summary judgment because petitioner's claim is foreclosed by *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), and *Thompson v. Calderon*, 109 F.3d 1358, 1373 (9th Cir.1996). Petitioner contends that, although instructions which create a presumption of death are not per se unconstitutional, they may be under the circumstances of a particular case. *Siripongs*, 35 F.3d at 1322–23.

At the penalty phase, petitioner's jury was instructed that "[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without possibility of parole." (CT 562.) In *Boyde*, the Supreme Court held that this instruction did not violate the Eighth and Fourteenth Amendments. *Id.* at 377, 110 S.Ct. 1190. In *Thompson*, the Ninth Circuit rejected a challenge to the same instruction. 109 F.3d at 1373, *superseded on other grounds*, 120 F.3d 1045 (9th Cir.), *cert. granted*, 521 U.S. 1140, 118 S.Ct. 16, 138 L.Ed.2d 1048 (1997). Therefore, respondent is entitled to judgment as a matter of law and the Court GRANTS the motion for summary judgment as to this claim.[10]

## Claim U: Improper Antisympathy Instruction and Factor (k) Instruction

Petitioner argues that the death penalty was "unconstitutionally imposed because the sentencing jury was precluded from giving independent weight to mitigating aspects of [his] character and background." (Pet. at 77.) Petitioner's claim has two parts. First, he claims the trial court erred in giving an instruction that the jury was not allowed to consider sympathy at the penalty phase. Second, he argues that the instructions precluded the jury from considering the mitigating evidence presented by his attorney in his closing argument.

### 1. Antisympathy Instruction

At the guilt phase, the jury was instructed that it was "not [to] be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." (CT 444.) The instruction was not repeated at the penalty phase, nor was the jury told to disregard it.

 Respondent is entitled to summary judgment on the "antisympathy" part of the claim. In *California v. Brown*, 479 U.S. 538, 543, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the Supreme Court held that the instruction given in petitioner's case does not violate the provisions of the Eighth and Fourteenth Amendments. The high court noted that a reasonable juror would interpret the instruction to avoid deciding the case on "mere ... sympathy" as a directive to ignore only the sort of sympathy which would be totally divorced from evidence presented at the penalty phase. In addition, in this case, the prosecutor did not argue that the jury could not consider sympathy, and the defense attorney specifically told the jury "[c]ontrary to what you were instructed in

---

**10.** In *Siripongs*, the petitioner argued that the state court erred in not granting him relief under state law, and that he had a liberty interest in the consistent application of state law. 35 F.3d at 1322–23. Petitioner does not make the same argument in this case, therefore, *Siripongs* is inapposite.

the other phase, you have the right, indeed the obligation, to consider in this phase of the trial as to the defendant with sympathy for him, compassion for him, and yes, even mercy for him." (12 RT 3049.) Therefore, under the circumstances of petitioner's trial, it is unlikely that the jury would have felt that they could not consider sympathy or mercy in deciding the appropriate penalty. The "antisympathy" instruction did not mislead the jury about their responsibility to consider all relevant mitigating evidence. *See Williams*, 52 F.3d at 1481. The Court GRANTS summary judgment as to this portion of the claim.

### 2. *Trial Court's Instruction Regarding Factor (k)*

Petitioner contends that California's death penalty statute and the instructions given in this case unconstitutionally precluded the jury from giving mitigating weight to his character, background, and other mitigating evidence that was unrelated to the crimes.

 The trial court instructed the jury that, under Cal.Penal Code § 190.3(k), they could consider as mitigating evidence "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime." (CT 561.) Petitioner argues that this instruction only allowed the jury to consider mitigating evidence relating to the crimes themselves and did not allow them to consider other mitigating evidence which did not relate specifically to the crimes.

The United States Supreme Court rejected an identical claim in *Boyde*, 494 U.S. at 386, 110 S.Ct. 1190. The Court found that the challenged instruction did not limit the jury's consideration to evidence that was related only to the crime itself. *Id.* at

382, 110 S.Ct. 1190. The Court then noted that, even if the instruction was ambiguous, it was clear under the circumstances of Boyde's case that the jury properly considered all relevant mitigation evidence. In that case the mitigating evidence related almost exclusively to the defendant's background and character. The Court stated that "reasonable jurors would not have felt constrained by the factor (k) instruction to *ignore all* of the evidence presented by petitioner during the sentencing phase." *Id.* at 383–84, 110 S.Ct. 1190. In *Boyde*, the prosecutor assumed that Boyde's mitigation evidence was a proper factor in the weighing process, but contested whether that evidence merited the lesser penalty of life in prison; he never contested the jury's right or duty to consider it. *Id.* at 385, 110 S.Ct. 1190.

Although the mitigating evidence in this case did not relate to petitioner's background or character, petitioner's trial counsel argued that the death penalty was not a deterrent (12 RT 3052); that many enlightened countries and states have done away with the death penalty (12 RT 3054); that there was lingering doubt about petitioner's guilt and that his innocence might never be discovered if he were to be executed; and that petitioner was "sick." (12 RT 3065.) None of these arguments related to the crimes for which petitioner was convicted. Neither the prosecutor nor the trial judge told the jury that they could not consider defense counsel's arguments. Based on all of the circumstances, there is "no reasonable likelihood that the jury applied the instruction in a way that prevent[ed] the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190. Therefore, the Court GRANTS summary judgment on this claim.[11]

---

**11.** Petitioner cites to a number of research studies that have allegedly shown that the assumption made by the *Boyde* court—that a jury will understand that the universe of potentially mitigating factors is entirely open-ended and is not limited either by negative implication from, or by analogy to, the listed factors—is false. (Opp.220–225.) However, the studies cited by petitioner are insufficient, even if taken as true, to provide a basis for this Court to refuse to follow clear United States Supreme Court precedent.

### Claim V: The Trial Court Failed to Delete Inapplicable Mitigating Factors

██ Petitioner contends that his constitutional rights were violated by the trial court's failure to delete the irrelevant factors from the California death penalty statute, Cal.Penal Code § 190.3.[12]

The jury in petitioner's case was instructed that it was to consider the listed factors "if applicable." (CT 559.) The words "if applicable" told the jury that not all of the factors would be relevant and that they should not consider the factors that did not apply. The Ninth Circuit has rejected identical claims in *Williams*, 52 F.3d at 1481, and *Bonin*, 59 F.3d at 848, therefore, the Court GRANTS summary judgment on this claim.

### Claim W: Unadjudicated Prior Criminal Activity

Petitioner argues that his constitutional rights were violated because the prosecutor introduced, and the jury considered as a factor in aggravation, evidence of alleged violent conduct for which he was never charged. (Pet. at 81.) Respondent argues that the state court's findings of fact relating to this issue should be presumed correct and that those findings dispose of petitioner's claim. (Mot. at 298.)`

At the guilt phase of petitioner's trial, the prosecution introduced evidence of petitioner's escape plan and a death threat directed at Blackie Coward. Petitioner was never charged with any crime arising out of that conduct. He argues that the jury could have considered this evidence under § 190.3(b)—the presence or absence

of violent criminal activity by the defendant. Evidence may not be considered under § 190.3(b) unless the trial court instructs the jury on the elements of the alleged violent criminal activity, and that the jury must find beyond a reasonable doubt that petitioner committed the alleged crimes. *People v. Cummings*, 4 Cal.4th 1233, 1312, 18 Cal.Rptr.2d 796, 850 P.2d 1 (1993).

The state court found that the prosecutor did not argue that the evidence relating to the escape plan and death threat applied under § 190.3(b), but that he argued that they applied under 190.3(a) and (d), therefore, the trial court did not err in failing to instruct the jury on the elements of the alleged crimes or that they had to find beyond a reasonable doubt that petitioner committed the crimes. The state court then held that, assuming it was error for the prosecutor to refer to the evidence in his discussion of § 190.3(a), "on the facts of this case we cannot imagine this amounted to reversible prejudice under any standard." *Williams I*, 44 Cal.3d at 1147, 245 Cal.Rptr. 635, 751 P.2d 901.

Petitioner argues that the language of § 190.3(b) is vague. This argument is without merit as § 190.3(b) is not unconstitutionally vague. *Harris*, 465 U.S. at 51–54, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

██ As to the merits of petitioner's claim, the Court accepts the state court's finding of harmless error. "[S]tate courts in weighing states may still cure the consideration of improper factors in sentencing either by weighing or by conducting a harmless-error review." *Williams*, 52

---

12. The factors the jury may consider are: (a) the circumstances of the crime of which the defendant was convicted; (b) the presence or absence of violent criminal activity by the defendant; (c) the presence or absence of any prior felony conviction; (d) whether the offense was committed while the defendant was under the influence of extreme emotional or mental disturbance; (e) whether the victim was a participant in the defendant homicidal conduct or consented to the homicidal act; (f) whether the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct; (g) whether the defendant acted under duress or domination of another person; (h) whether the defendant was able to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law as a result of mental disease or defect or the effects of intoxication; (i) the age of the defendant at the time of the crime; (j) whether the defendant's participation in the commission of the offense was minor; and (k) any other circumstance which extenuates the gravity of the crime.

F.3d at 1480. California is a weighing state. Here, the state court conducted a harmless error analysis. The court ruled that, assuming the evidence was improperly admitted under 190.3(a), "on the facts of this case we cannot imagine this amounted to reversible prejudice under any standard." *Williams I,* 44 Cal.3d at 1147, 245 Cal.Rptr. 635, 751 P.2d 901. This review and conclusion satisfy the requirements for constitutional harmless error analysis. *Williams,* 52 F.3d at 1480. Therefore, the Court GRANTS summary judgment on this claim.

### Claim X: Failure to Distinguish Between Present and Prior Crime

 Petitioner argues that the prosecutor's argument at the penalty phase improperly allowed the jury to consider the circumstances of the crimes under two different aggravating factors. (Opp. at 229.) Respondent argues that he is entitled to summary judgment because, as a matter of law, the error was harmless. (Mot. at 307.)

California Penal Code § 190.3 lists the aggravating and mitigating factors the jury may consider in deciding the appropriate penalty. Subsection (a) of § 190.3 provides that the jury may consider the circumstances of the crime of which the defendant was convicted. Subsection (b) provides that the jury may consider the presence or absence of violent criminal activity by the defendant. Factor (b) applies only to criminal activity other than the crime adjudicated in the guilt phase. *People v. Miranda,* 44 Cal.3d 57, 241 Cal. Rptr. 594, 744 P.2d 1127 (1987).

In petitioner's case, after a lengthy discussion of the circumstances of the crime, the prosecutor stated:

So, the circumstances of the crime of which the defendant has been convicted are things that you take into consideration as one of the guidelines, one of the factors in determining whether the aggravating factors outweigh or don't outweigh the mitigating factors: 'The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or for the express or implied threat to use force or violence.'

And, of course, here we have overwhelming evidence of the defendant's use of force and violence, almost for their own sake, not because they're necessary. Just because he wants to use force and violence.

(12 RT 3031.)

The state court found that the prosecutor erred in telling the jury that the underlying crimes could be considered under § 190.3(b). The court then stated that "we find it difficult to believe the sheer 'number' of asserted aggravating factors flowing from the same underlying conduct unduly prejudiced the jury." *Williams I,* 44 Cal.3d at 1147, 245 Cal.Rptr. 635, 751 P.2d 901. Respondent urges the Court to adopt the state court's reasoning on this claim.

The prosecutor's comments were clearly improper, and the possible effect of allowing a jury to consider the underlying crimes as two aggravating circumstances is not trivial. However, based on all the circumstances, it does not appear that the prosecutor's arguments rendered the proceedings fundamentally unfair. The prosecutor's comment was relatively brief. The jury was instructed to weigh the aggravating and mitigating evidence; they were not told to count up aggravating factors on one side and measure them against the mitigating factors on another. (CT 562.) Jurors are presumed to follow instructions, *United States v. Span,* 75 F.3d 1383, 1390 (9th Cir.1996), whereas "arguments of counsel generally carry less weight than do instructions from the court." *Boyde,* 494 U.S. at 384, 110 S.Ct. 1190. In addition, the prosecutor told the jury to weigh the aggravating and mitigating circumstances to determine the appropriate penalty. (12 RT 3018.) Petitioner's attorney also told the jury that "if you find one mitigating quality existed—and there

are ten of them in aggravation—that one mitigating quality can outweigh all the others." (12 RT 3067.) The jury was adequately informed concerning their duty to weigh—not count and compare—the aggravating and mitigating evidence at the penalty phase. Moreover, the jury had already convicted petitioner of the murder of four people in two different robberies. The murders were cold and calculated efforts to eliminate witnesses to the crimes, and evidence was introduced that petitioner laughed when describing the death of one of the victims. The defense presented no mitigating evidence to reduce the impact of this evidence.

Based on all the circumstances, it is unlikely that the prosecutor's comments rendered the trial unfair, and the Court GRANTS summary judgment as to this claim.

### Claim Y: Jury's Exposure to Extrinsic Information

Petitioner claims his jury received improper extrinsic information when he made a comment to his lawyer that was overheard, or misunderstood, by some of the jurors. (Pet. at 88.) Respondent argues that he is entitled to summary judgment because the state court's denial of this claim bars federal habeas review, because federal law mandates denial of the claim, and because any error was harmless.

On the day the jury began its penalty phase deliberations, an alternate juror told the bailiff that the jury believed petitioner had threatened them after the guilt verdict was returned. The trial court questioned the alternate who reported the remark, Gertrude Bela. She stated that the jurors sitting in the center told her that petitioner looked at the jury and said he was going to get all of them. *Williams I*, 44 Cal.3d at 1154–55, 245 Cal.Rptr. 635, 751 P.2d 901. The court then separately questioned three alternate jurors, asking each of them whether petitioner said anything to them. Each alternate responded with "Not today" or "Nothing today." The trial court observed that there had been a misunderstanding and that petitioner's comment was made to his attorney after the guilt phase verdicts were read. Trial counsel explained to the judge that petitioner had asked him, "[A]re those the sons-of-bitches who are going to decide what happens to me?" (12 RT 3074.) The trial court then brought in the jury foreman, John Bramhall, and asked him the following:

THE COURT: It has come to the court's attention that there is a possibility that some remark might have been made by the defendant that was heard by the jury on the date that the jury returned its verdict at the guilt phase. Do you have any information concerning that?

MR. BRAMHALL: I do.

THE COURT: What is that?

MR. BRAMHALL: He did utter a statement as we were concluding.

THE COURT: What was that statement?

MR. BRAMHALL: "I'm going to get each and every one of you mother fuckers."

THE COURT: Did you personally hear him make that statement?

MR. BRAMHALL: I did not. I saw him mouthing it; but I did not hear it.

THE COURT: In other words, were you able to make out the words?

MR. BRAMHALL: I was not. One of the other jurors was.

THE COURT: All right. Did that play any part in the deliberations of this case concerning the penalty?

MR. BRAMHALL: It did not.

THE COURT: Was there any discussion of that comment at any time during the penalty phase of this trial?

MR. BRAMHALL: No. Not until after the verdict had been reached.

THE COURT: You've now reached a verdict?

MR. BRAMHALL: We have.

(12 RT 3077–3078.)

The jury was then brought into the courtroom and the verdict was read. Defense counsel requested individual voir dire to determine whether the comment had been discussed during the penalty deliberations. The trial court stated that it was willing to accept the foreman's word that the matter had not been discussed until after the verdict was returned, and that, in any case, petitioner had created the situation. (12 RT 3083.)

### 1. *Procedural Bar*

The state supreme court found that, although jurors may not properly consider evidence obtained from extrinsic sources, a defendant may not profit from his own misconduct as a matter of policy. *Williams I,* 44 Cal.3d at 1156, 245 Cal. Rptr. 635, 751 P.2d 901. Respondent argues that the state court's decision on this claim is a procedural bar which precludes federal habeas review.

#### a. *Law on Procedural Bar*

■ "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). This doctrine is based on considerations of federalism and comity. *See Michigan v. Long,* 463 U.S. 1032, 1040, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

■ To determine whether a state procedural rule is adequate, the Court must find that the procedural rule is "strictly or regularly followed." *Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). The state rule need not be followed in every case where the bar is applicable. However, the rule must, at a minimum, be applied in the "vast majority of the cases." *Dugger v. Adams,* 489 U.S. 401, 410 n. 6, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989).

The procedural rule must also have been firmly established at the time of the default. "If the petitioner's failure to raise a claim did not violate any then-existing rule, he did not commit a procedural default." *English v. United States,* 42 F.3d 473, 477 (9th Cir.1994).

■ Where the state court has ruled both on independent state grounds as well as on the merits of the federal claim as an explicitly alternative holding, the existence of the independent state grounds maintains the federal bar. *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The state court's opinion must "clearly and expressly" indicate that the state ground is an alternative holding. *Sochor v. Florida,* 504 U.S. 527, 112 S.Ct. 2114, 2119, 119 L.Ed.2d 326 (1992).

If a claim is found to be procedurally barred by an adequate and independent state law ground, in appropriate circumstances, a federal court may still review the merits of the defaulted claim. "The doctrine of procedural default is based on comity, not jurisdiction, and the federal courts retain the power to consider the merits of procedurally defaulted claims." *Harmon v. Ryan,* 959 F.2d 1457, 1461 (9th Cir.1992). However, petitioner must "show cause for the default and prejudice attributable thereto, or demonstrate that the failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris,* 489 U.S. at 262, 109 S.Ct. 1038 (internal quotations omitted).

#### b. *Merits of Respondent's Argument*

Respondent's argument fails because the state supreme court made no "clear and express" statement that it was relying on a state procedural rule to deny the claim. The state court noted that, generally, jurors may not obtain evidence from extrin-

sic sources. The court then stated "[i]t is not clear, however, that such a rule applies to jurors' perceptions of the defendant, particularly when the defendant engages in disruptive or otherwise improper conduct in court." *Williams I*, 44 Cal.3d at 1156, 245 Cal.Rptr. 635, 751 P.2d 901. The court went on to address the general rule that a defendant is not permitted to profit from his own misconduct. The state court found that any presumption of prejudice which arose from the jury's consideration of the comment had been rebutted by the foreman's statement that the comment had not been discussed during deliberations. Therefore, the state supreme court did not clearly and expressly rely on a state procedural rule to deny the claim, instead, it found that any error was harmless. *Id.* at 1157, 245 Cal.Rptr. 635, 751 P.2d 901. Because the state court's decision is not based on a state procedural rule, but rather was a decision on the merits, its decision does not bar federal review of this claim.

### 2. Federal Court Bar

■ Respondent argues that, assuming the state court decision is not a valid procedural bar, the claim should be denied based on the federal rule that a habeas petitioner may not inject error into the proceeding by his own actions. He cites *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), and *Mata v. Johnson*, 99 F.3d 1261 (5th Cir.1996), in support of his argument. Petitioner argues that the Court should not accept respondent's invitation to create a new rule, but instead should consider how the evidence got to the jury as only one factor in its decision.

In *Allen*, the Supreme Court held that a trial court may remove an obstreperous defendant from the courtroom and conduct the trial without him if the court warned the defendant of the consequences of his actions and allowed him to re-enter the courtroom if he promised to behave himself. 397 U.S. at 347, 90 S.Ct. 1057. In its holding, the Court noted that, if a defendant were allowed to indefinitely delay a trial by inappropriate action, he could "profit from his own wrong." *Id.* at 345, 90 S.Ct. 1057.

In *Mata*, the defendant's attorney and the prosecutor agreed to exclude all African–American venirepersons from the petitioner's jury. 99 F.3d at 1264. In his federal habeas petition, the petitioner argued that the agreement violated the Equal Protection Clause. *Id.* at 1265. The Fifth Circuit held that "any time that a defendant requests a new trial on the basis of his own constitutional violation, we shall consider the facts peculiar to that case, balance the competing harms to the system, and choose the course of action that we believe will do the least damage to the system and to the peoples' perception of it." *Id.* at 1270–71.

Respondent argues that the Court should adopt the ruling in *Mata*. He argues that to grant relief on this claim would allow any criminal defendant to obtain a new trial by prejudicing the jury by his own actions. (Mot. at 316.) According to respondent, if Williams were allowed to obtain a new trial because of his inappropriate outburst, any defendant in the future could sabotage his case and ensure a new trial on appeal by engaging in inappropriate or obstreperous conduct. To avoid this result, respondent argues that the Court should deny relief because petitioner's own conduct forms the basis of the claim. Respondent's argument is persuasive, and the Court adopts the analysis in *Mata*.

Federal habeas corpus review entails significant costs. First, granting a habeas writ erodes the finality of criminal convictions. When a petitioner obtains a new trial on federal habeas review, the "erosion of memory and dispersion of witnesses that occur with the passage of time prejudice the government and diminish the chances of a reliable criminal adjudication." *McCleskey v. Zant*, 499 U.S. 467, 491, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (quotation and citation omitted). The con-

cept of finality is especially important when a federal court reviews a state conviction. This review "frustrate[s] . . . 'both the States' sovereign power to punish offenders and their good faith attempts to honor constitutional rights.'" *Murray v. Carrier*, 477 U.S. 478, 487, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (quoting *Engle*, 456 U.S. at 128, 102 S.Ct. 1558). Finally, "federal collateral litigation places a heavy burden on scarce federal judicial resources, and threatens the capacity of the system to resolve primary disputes." *McCleskey*, 499 U.S. at 491, 111 S.Ct. 1454.

The Court GRANTS the motion for summary judgment. Petitioner himself, although perhaps not intending to, caused the problem he now complains of. If the Court granted petitioner's claim, any criminal defendant could ensure himself a new trial by acting inappropriately and causing the jury to become prejudiced against him. In light of the concerns of finality and comity involved in the federal review of a state court conviction, the Court finds that denying petitioner's claim is "the course of action that . . . will do the least damage to the system and to the peoples' perception of it." *Mata*, 99 F.3d at 1270–71.

The Court also finds that petitioner's outburst did not prejudice him at trial. The trial court asked the jury foreman if the petitioner's statement was discussed during, or played any part in, the jury's penalty deliberations. The foreman stated under oath that it had not. Based on all of the circumstances, it is highly unlikely that the extrinsic information at issue had a "substantial and injurious effect or influence on the verdict." *Brecht*, 507 U.S. at 638, 113 S.Ct. 1710.

**Claim Z: Exclusion of Photographs and Argument**

Petitioner argues that the exclusion of certain evidence at the penalty phase violated his right to present mitigating evidence. (Pet. at 90.) Respondent argues that petitioner's claim is moot and that California had the right to bar consider-

ation of evidence and argument concerning its method of execution.

During his penalty phase argument, defense counsel attempted to show the jury photographs of a California gas chamber execution. The prosecutor objected and the trial court ruled the photographs inadmissible and precluded any reference to them. The court also precluded counsel from describing how gas chamber executions are carried out. (12 RT 3062–64.)

**1. *Petitioner's Claim is Not Moot***

Respondent's first argument is that petitioner's claim is moot because California now requires the use of lethal injection as the mode of execution unless the prisoner affirmatively chooses lethal gas. Respondent is incorrect. The issue before the Court is whether petitioner was unconstitutionally precluded from presenting relevant mitigating evidence. At the time of petitioner's trial, lethal gas was the mode of execution in California. Petitioner is not arguing that he has a right to present evidence relating to executions by lethal gas regardless of how his execution might take place. He is arguing that he had a right, at the time of his trial, to present evidence regarding the details of his potential execution. That question is still a "live" controversy.

**2. *California May Preclude Evidence of the Details of Executions***

Beginning with *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the United States Supreme Court has repeated that "the sentencer [must] . . . not be precluded from considering *as a mitigating factor*, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (quoting *Lockett*, 438 U.S. at 604, 98 S.Ct. 2954 (plurality))). *Skipper* held that a defendant must be allowed to present

evidence of "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison." *Id.* at 7, 106 S.Ct. 1669.

▇ On the other hand, *Lockett* did not limit the "traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." 438 U.S. at 604 n. 12, 98 S.Ct. 2954. States have the discretion to determine what sentencing factors are relevant to the penalty determination and they are not required to allow a defendant to introduce evidence that is not related to his character, background, future dangerousness, or the circumstances of the crime. *See, e.g., Glass v. Butler,* 820 F.2d 112, 115–16 (5th Cir.1987) (holding evidence of church's opposition to death penalty not relevant); *Johnson v. Thigpen,* 806 F.2d 1243, 1250–51 (5th Cir.1986) (holding purported irrationality of Mississippi's definition of capital murder, a description of the execution, and the issue of whether imposing a sentence of death is morally equivalent to killing not relevant to a defendant's character or offense), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1618, 94 L.Ed.2d 802 (1987); *Brogdon v. Blackburn,* 790 F.2d 1164, 1169 (5th Cir.1986) (holding codefendant's life sentence not relevant to defendant's character or offense), *cert. denied,* 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987); and *Martin v. Wainwright,* 770 F.2d 918, 936 (11th Cir.) (holding failure to admit evidence on deterrent effect of death penalty does not violate *Lockett* because it does not help the sentencer focus on the unique characteristics of the defendant), *modified,* 781 F.2d 185 (11th Cir.1986), *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986).

This error, if any, is also subject to a harmless error test. *Skipper,* 476 U.S. at 8, 106 S.Ct. 1669. Respondent is entitled to summary judgment if the error did not have "a substantial and injurious effect or influence in determining the jury's ver-

dict." *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710.

▇ The Court GRANTS summary judgment on this claim. Petitioner has an unfettered right to present evidence at the penalty phase relating to "any aspect of [his] character or record and any of the circumstances of the offense." *Skipper,* 476 U.S. at 4, 106 S.Ct. 1669. However, the evidence Williams sought to introduce was not relevant to the sentencing determination. At its heart, the penalty phase of the trial is designed to separate those defendants who deserve the death penalty, and those who, because of the nature of the crime, their background, and the circumstances of their actions during the crime, are less deserving of the death penalty. *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Evidence regarding the manner in which the death penalty is carried out does not help the jury decide whether a particular defendant is more or less deserving of the ultimate punishment. Every person sentenced to death in California at the time of petitioner's trial faced the same method of execution. Details of the execution are not relevant to the appropriate sentence and the state court could properly exclude the proffered evidence.

### Claim AA: Unconstitutionality of the Death Penalty Statute

Petitioner claims the California capital sentencing system is unconstitutional as it does not provide for (1) a specific and objective enumeration of aggravating and mitigating factors to guide the penalty jury; (2) a requirement of written findings on any aggravating factors found true; (3) a requirement that the prosecution prove the existence of any aggravating factors beyond a reasonable doubt; (4) a requirement of penalty jury unanimity regarding the presence of an aggravating factor found in support of the death judgment; (5) a requirement that the penalty jury determine unanimously and beyond a reasonable doubt that death is the appropri-

ate penalty; and (6) comparative sentence review.

### 1. *Enumeration of aggravating and mitigating factors*

The statute's failure to label factors as aggravating and mitigating is constitutional. *Williams,* 52 F.3d at 1484.

### 2. *Requirement of written findings on aggravating factors*

The statute need not require written findings to be constitutional. *Id.* at 1484–85.

### 3. *Requirement that the prosecution prove aggravating factors beyond a reasonable doubt*

 Petitioner fails to provide any specific argument or explanation in either the petition or his opposition for this subclaim beyond bare allegations of unconstitutionality. The United States Supreme Court and the Ninth Circuit have consistently upheld both the 1977 and 1978 versions of the California death penalty statute and, without presenting additional facts or law, petitioner has failed to establish that he is entitled to relief on this claim. Moreover, "[a]ggravating circumstances are not separate penalties or offenses, but are standards to guide the making of the choice between the alternative verdicts of death and life imprisonment." *Poland v. Arizona,* 476 U.S. 147, 156, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986) (citation omitted). In this case, the prosecution used the circumstances of the crime as an aggravating factor. For petitioner to be convicted in the guilt phase the prosecution had to establish that he was guilty of the crimes beyond a reasonable doubt, therefore, petitioner suffered no prejudice from the statute's failure to require that the jury find that the prosecution proved the aggravating factors beyond a reasonable doubt.

### 4. *Requirement of penalty jury unanimity regarding aggravating factors*

 Petitioner fails to provide any specific argument or explanation in either the petition or his opposition to support this claim beyond bare allegations of unconstitutionality. Without presenting additional facts or law, petitioner has failed to establish that he is entitled to relief on this claim. Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief. *See Boehme v. Maxwell,* 423 F.2d 1056, 1058 (9th Cir.1970).

### 5. *Requirement that the penalty jury determine unanimously and beyond a reasonable doubt that death is the appropriate penalty*

The failure of the statute to require a specific finding beyond a reasonable doubt that death is the appropriate penalty is constitutional. *Williams,* 52 F.3d at 1485.

### 6. *Comparative sentence review*

The Constitution does not require comparative proportionality review. *Pulley v. Harris,* 465 U.S. 37, 51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

 Petitioner argues that *Harris* does not dispose of his claim because his claim is that the failure to provide comparative sentence review violates the Equal Protection Clause, which was not addressed by *Harris.* He contends that, if petitioner had been sentenced to life in prison without parole, the Board of Prison Terms would have been required to "review the sentence to determine whether the sentence is disparate in comparison with the sentences imposed in similar cases." Former Cal.Pen.Code § 1170(f).[13]

Petitioner's argument is not factually or legally developed. He does not discuss the nature of the classifying trait, the standard of review to be used, the objective of the law, and whether the classification involves fundamental rights. These are all issues that must be addressed in an Equal Protection claim. *See Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440–41,

**13.** This provision was repealed in 1992. Cal. Stats.1992, Ch. 695, § 10.

105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Heller v. Doe,* 509 U.S. 312, 319–21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

The statute at issue would most likely be subject to the rational-basis standard of review. A classification "neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller,* 509 U.S. at 319–20, 113 S.Ct. 2637 (citations omitted). "A statute is presumed constitutional . . . and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Id.* at 320, 113 S.Ct. 2637 (quotation and citation omitted). Petitioner's bare allegations of unconstitutionality are insufficient to support this claim. Moreover, it is unlikely that he could prevail on this claim even with further briefing. As the United States Supreme Court noted, "[t]he deference we owe to the decisions of the state legislatures under our federal system . . . is enhanced where the specification of punishments is concerned for these are peculiarly questions of legislative policy." *California v. Ramos,* 463 U.S. 992, 1000, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). Given that level of deference, it is unlikely that petitioner could show that the disparate treatment of capital defendants in the comparative review of sentences is not rationally related to a conceivable legislative purpose. *See Heller,* 509 U.S. at 320, 113 S.Ct. 2637.

Based on the foregoing, the Court GRANTS the motion for summary judgment as to Claim AA.

### Claim AB: Improper Jail Monitoring

Petitioner claims his jail conversations were monitored during the months that he prepared for trial, and that jail personnel obtained confidential documents appointing a defense psychiatrist. As a result of the breach of confidentiality concerning the expert's appointment, and as a result of the monitoring, the expert refused to provide assistance to the defense because he was unwilling to talk to petitioner if the conversation would be monitored.

Respondent argues that he is entitled to judgment as a matter of law on this claim because petitioner has failed to allege facts indicating that conversations between he and his attorney or he and his retained psychiatrist were monitored, and has failed to allege facts indicating what, if anything, the psychiatric examinations would have disclosed. Petitioner argues that he did not allege that the conversation between he and his psychiatrist was monitored because, as a result of the threat of monitoring, the conversation did not take place. Petitioner also notes that, in light of the extensive documentation he has presented in support of his mental health claims, he has alleged facts showing what psychiatric testimony would have disclosed.

■ Respondent's argument is slightly misplaced, but is not without merit. Petitioner has presented evidence that he was suffering from mental problems at the time of the murders and at trial. However, he has failed to allege how the improper monitoring violated his constitutional rights. Even assuming the jail monitoring occurred and was improper, petitioner must show that he was denied a fair trial. Petitioner's trial attorney could have retained another mental health expert who would have met with petitioner, he could have asked the trial court to order the prosecution to stop the jailhouse monitoring while petitioner was being interviewed, or he could have asked the mental health expert to review petitioner's social and medical history to determine if a mental health defense was at least possible. Petitioner may have a valid claim that his trial attorney failed to adequately investigate and present evidence of his mental health at trial. However, the fact that one mental health expert declined to assist the defense because of the jailhouse monitor-

ing is not sufficient to establish a denial of the right to a fair trial.

Therefore, the Court GRANTS the motion for summary judgment on the grounds that petitioner has failed to allege facts amounting to a violation of his constitutional rights.[14]

IT IS SO ORDERED.

---

14. Since the Court has granted the motion on this argument by respondent, the Court did not address his other grounds for seeking summary judgment as to Claim AB.